IN THE COMMONWEALTH COURT OF PENNSYLVANIA

William L. Ives, M.D., : 
               Petitioner : 
                : 
        v. : No. 646 C.D. 2018
         : Argued: December 13, 2018
Bureau of Professional and : 
Occupational Affairs, State : 
Board of Medicine, : 
             Respondent : 


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT               FILED: February 28, 2019

      William L. Ives, M.D., petitions for review of an adjudication of the State Board of Medicine (Board) concluding that Dr. Ives performed a surgery in 2012 that departed from the accepted standard of care. The Board ordered Dr. Ives to undergo a clinical competency skills assessment and a public reprimand. On appeal, Dr. Ives contends, *inter alia*, that the Board erred and abused its discretion in admitting hearsay evidence and relying on an expert opinion that was incompetent on the issue of standard of care because it lacked a proper factual foundation. Concluding that these issues have merit, we reverse the Board's adjudication.

## Background

      On December 2, 1986, Dr. Ives was licensed to practice medicine and surgery in the Commonwealth of Pennsylvania. He is certified by the American Board of Surgery. Dr. Ives practices as a general and colorectal surgeon, with staff privileges at Lancaster General Hospital.

On December 28, 2012, Dr. Ives operated on S.L. (Patient) at Ephrata Community Hospital to remove a colon tumor in a surgery that took several hours. During surgery, Patient began to bleed, which the operating team was unable to stop. A second surgeon called by Dr. Ives was also unable to stop the bleeding. Dr. Ives ordered an infusion of platelets for Patient to stop the bleeding, but the platelets were not delivered by the hospital. Patient was transferred to the intensive care unit (ICU), where she died three hours later while awaiting a transfer to Hershey Medical Center.

On March 30, 2015, the Board instituted a disciplinary action against Dr. Ives, alleging that his treatment of Patient fell below the accepted standard of care. The Board sought a license suspension, revocation or restriction, penalties and costs. In October 2016, an administrative hearing was held. The Department of State's Bureau of Professional and Occupational Affairs (Bureau) prosecuted the case.

Christopher Connolly, an investigator for the Bureau, testified about the records he obtained from Ephrata Community Hospital by subpoena. Specifically, Connolly obtained Patient's medical records and the transcripts of a peer review proceeding conducted by Ephrata Community Hospital to revoke Dr. Ives' staff privileges.[1]

Gordon L. Kauffman, Jr., M.D., testified on behalf of the Bureau. Dr. Kauffman is a Professor Emeritus at the Pennsylvania State University, College of Medicine in Hershey, Pennsylvania, where he served as a professor of surgery for 32 years. He is certified by the American Board of Surgery.

---

[1] Ephrata's Community Hospital's by-laws allow a physician to request a "fair hearing" upon receipt of notice that the hospital intends to revoke clinical privileges. Dr. Ives elected to have a hearing, at which he was represented by counsel. The proceedings were recorded. Each witness was placed under oath and was subject to cross-examination by counsel, and by members of the hearing panel.

2

Dr. Kauffman testified that the Bureau retained him to evaluate Dr. Ives' treatment of Patient. To that end, he reviewed Patient's medical records and the transcripts from the peer review proceeding (Peer Review Transcript) conducted by Ephrata Community Hospital. Dr. Kauffman prepared an expert report that concluded that Dr. Ives failed to meet the accepted standard of care in three ways: (1) Dr. Ives did not "seem to give any credence" to what was being told to him by the anesthesiology team during the surgery; (2) Dr. Ives' "responses to the anesthesia team" reflected "a lack of engagement or inability to accept concerns of a less than favorable outcome" that led him to continue, not terminate, the surgery; and (3) postoperatively, Dr. Ives abandoned Patient, leaving her in the ICU in the care of another physician. Kauffman Report at 5-6; Reproduced Record at 1090a-91a (R.R. ____).

In support of these conclusions, Dr. Kauffman presented a narrative of what happened to Patient during surgery. This narrative was based upon the documents obtained by Connolly from Ephrata Community Hospital related to the peer review proceeding.

Dr. Kauffman stated that, on November 26, 2012, Dr. Ives met with Patient, who was experiencing blood in her stools. On November 30, 2012, a colonoscopy was performed that showed "a nearly obstructing colorectal carcinoma at rectal sigmoid junction[.]" Notes of Testimony, 10/24/2016, at 28 (N.T. __); R.R. 41a. Patient elected to have the tumor surgically removed.

On December 28, 2012, at approximately 8:00 a.m., Dr. Ives began the surgery to remove the tumor. At 10:45 a.m., the anesthesia records showed that

3

Patient's hematocrit[2] and hemoglobin[3] levels had fallen and that there was bleeding. The nurse anesthetist spoke to Dr. Ives about the blood loss. At 11:00 a.m., the nurse anesthetist again spoke to Dr. Ives about Patient's blood loss, and Patient was administered a unit of packed red blood cells. Dr. Kauffman testified that Dr. Ives proceeded with the surgery in spite of the concern expressed about Patient's blood loss.

Dr. Kauffman stated that around 12:00 p.m., the anesthesia records reported cardiovascular instability. At 12:45 p.m., Patient received a vasoconstrictor medication to increase her blood pressure. The operating room team, concerned about Patient's ongoing blood loss, suggested that Dr. Ives call a second surgeon for assistance. Dr. Ives did not do so. At 2:00 p.m., Patient was hypotensive.

At 3:00 p.m., Dr. Ives requested surgical assistance. When the second surgeon arrived, Patient was in shock. The second surgeon packed Patient's abdomen and sewed two arteries to the pelvis to reduce the ongoing bleeding. These efforts did not improve Patient's condition.

Regarding the accepted standard of care on Dr. Ives' communication with and responses to the anesthesia team, Dr. Kauffman testified as follows:

> [There was a] *lack of discussion between Dr. Ives and the anesthesia team, between Dr. Ives and the [operating room] team.* Other people could see that the blood loss was continuing without control. They mentioned that to him. So lack of getting control of the bleeding, lack of a dialogue that's critical in situations like this between the surgeon and the anesthesia team, the surgeon and the [operating room] team…

---

[2] Dr. Kauffman explained that hematocrit "is the percentage of red cells in a given volume of blood[,]" and it is an indication of the ability of the blood to carry oxygen to tissues. N.T. 32; R.R. 45a.

[3] Hemoglobin is a protein in the red blood cell to which oxygen attaches so that it can be carried throughout the body.

4

> … Dr. Ives did not seem to give any credence to what was being told to him by the anesthesia team and the [operating room] staff. Rather than considering what was occurring at several time points, perhaps packing to control bleeding when the patient was unstable from a cardiovascular standpoint, allowing the anesthesia team to catch up with the blood loss, *recognizing much earlier that hemostasis was inadequate, and requesting surgical support from a surgical or gynecological colleague would have been the standard of care*.

N.T. 48-50; R.R. 61a-63a (emphasis added). With respect to postoperative abandonment, Dr. Kauffman testified: "In my opinion, the surgeon stays with the patient until some final disposition is made." N.T. 58; R.R. 71a. Dr. Kauffman opined that Dr. Ives compromised Patient's care by leaving the hospital.

Dr. Kauffman opined that when Patient became unstable at 2:00 p.m., the accepted standard of care required Dr. Ives to establish hemostasis rather than proceed with the operation. Dr. Kauffman also opined that by waiting until 3:00 p.m. to call a second surgeon, Dr. Ives departed from an acceptable standard of care. Had assistance been called earlier, the outcome could have been different.

On cross-examination, Dr. Kauffman acknowledged that he did not know that during the surgery Dr. Ives had ordered platelets for Patient that were never delivered. He also did not know that Dr. Ives transferred Patient's care in the ICU to another physician only because he had been called to an emergency at another hospital. Dr. Kauffman did not know that Dr. Ives met with Patient's family in the ICU before departing the hospital. In addition, Dr. Kauffman acknowledged that he had not reviewed Patient's postoperative records, her fluid intake and output report, and the record of Dr. Ives' orders during surgery.

At the conclusion of its case, the Bureau moved for the admission of a letter from Ephrata Community Hospital, Patient's medical records, the Peer Review Transcript, and Dr. Kauffman's *curriculum vitae* and expert report.

5

Dr. Ives then testified. He explained that in addition to removing the tumor, it was necessary to do a hysterectomy because the tumor had connected to Patient's uterus. He estimated the surgery would take approximately four to five hours.

Dr. Ives testified that when he made a midline incision on Patient's abdomen, he noticed "a little bit more oozing" than expected. N.T. 141; R.R. 154a. At approximately 10:45 a.m., the nurse anesthetist informed him of Patient's hemoglobin and hematocrit levels. However, Dr. Ives did not consider these levels striking because Patient was receiving crystalloid fluids, which cause hemoglobin and hematocrit levels to drop. The anesthesia team suggested giving blood to Patient, and he agreed. Dr. Ives explained that he is generally hesitant to give blood to a cancer patient because the transfusion can suppress the immune system. At 11:30 a.m., Dr. Ives gave the order to maintain two units of packed red blood cells at all times. At 12:15 p.m., he ordered two units of fresh frozen plasma.

Dr. Ives testified that at approximately 2:00 p.m., Patient became hypotensive. The anesthesiologist called out to "hold up" because the anesthesiology team needed "to catch up." N.T. 144; R.R. 157a. Dr. Ives stated that he immediately stopped, packed Patient, and inquired into what was going on. He then learned how much blood Patient had lost, which Dr. Ives described as "staggering." N.T. 146; R.R. 159a. Dr. Ives testified that because the anesthesiologist did not notify him each time Patient was given blood (and usually does not do so), Dr. Ives "didn't realize how much blood was lost." N.T. 148; R.R. 161a. Fresh frozen plasma usually stops bleeding in patients with a bleeding disorder. Because the frozen plasma did not achieve this result, Dr. Ives ordered platelets for Patient.

6

Dr. Ives denied failing to respond when Patient became unstable from a cardiovascular standpoint. He testified that

> *whenever she became unstable, I immediately stopped.* There's no sense in continuing if the patient might not survive. So when they said she was unstable, I immediately packed her[.] *I waited until they gave the okay to finish the resection* and I rapidly got the specimen out. So within about 15 minutes or so after that, I had the specimen out. And the rest of the case, as long as everything is packed, you're hoping that they're going to be able to accomplish something until [the other surgeon] came in.

N.T. 173; R.R. 186a (emphasis added). Dr. Ives testified that he packed the abdomen and pelvis for an hour, but the blood loss did not stop. He then asked for surgical assistance.

Dr. Ives disputed Dr. Kauffman's opinion that he should have earlier requested help from another surgeon, stating that he did not need "surgical help for any technical" issues. N.T. 173; R.R. 186a. When Dr. Ives requested surgical assistance, it was because he was hoping for suggestions on how to stop the bleeding while they awaited the delivery of platelets.

Dr. Ives testified that Patient had a bleeding disorder, which was unknown before the surgery. The only chance of arresting her blood loss was with platelets. He ordered platelets twice, but they were not delivered in time to save Patient.

**Board Adjudication**

On March 20, 2017, the hearing examiner issued a proposed adjudication. In pertinent part, the hearing examiner found:

> 44. The first documented evidence of a problem with operative bleeding of [the patient] occurred at 10:45 a.m., as reflected in the anesthesia records…. (N.T. 31-32, 79,

7

141-142; Exhibits [Patient's Anesthesia Records] and [Expert Report])

* * *

49.   … [T]he certified nurse anesthetist in the operating room[] informed [Dr. Ives] what [Patient's] hemoglobin and hematocrit were, and asked if it would be okay to transfuse [Patient].  (N.T. 32, 141-142, 145)

50.   [Dr. Ives] voiced his hesitation about giving [Patient] a blood transfusion at this point owing to his preference not to transfuse these patients, but did not object to blood being ordered for [Patient] and stated that he had already typed and screened [patient] for two units of blood.  (N.T. 141-142)

* * *

53.   [Dr. Ives] gave verbal orders … regarding red blood cells and fresh frozen plasma.  (N.T. 143-144)

54.   The anesthesia record for [Patient] reveals that at 11:00 a.m. [Patient's] estimated blood loss and hemoglobin and hematocrit was again discussed with [Dr. Ives] and that red blood cells were ordered to be given.  (N.T. 33, 82; Exhibit [Patient's Anesthesia Records])

55.   [Dr. Ives] gave a verbal order at 11:30 to "maintain 2 units of [packed red blood cells] available typed & crossed @ all times."  (N.T. 83, 143-144; Exhibit [Ives' Physician's Orders])

56.   By 12:00 noon, [Patient] had lost 2,800 ccs of blood and showed cardiovascular instability; [Patient's] systolic blood pressure was hovering between 70 and 80.  (Exhibits [Patient's Anesthesia Records] and [Expert Report])

57.   The anesthesia and surgical team were concerned about the amount of blood loss and about the direction that the operation was taking. (N.T. 38, Exhibits [Peer Review Transcript] and [Expert Report])

58.   [Dr. Ives] gave another verbal order at 12:15 p.m. for "two units of fresh frozen plasma thawed and sent to [operating

8

room]," and the [operating room] charge nurse asked [Dr. Ives] if he wanted another surgeon called; [Dr. Ives] declined the offer. (N.T. 143-144; Exhibits [Ives' Physician's Orders], [Peer Review Transcript], and [Expert Report])

59. At 12:45 p.m. [Patient's] hemoglobin [was measured] at 7.8 and her hematocrit at 23; the anesthesia team found it necessary to give [Patient] a vasopressor, phenylephrine[,] to maintain her blood pressure. (Exhibits [Patient's Anesthesia Records], [Peer Review Transcript], and [Expert Report])

60. Over 100 saturated laparotomy sponges were reportedly used by operating room staff during [Patient's] surgical procedure. (N.T. 41; Exhibits [Peer Review Transcript] and [Expert Report])

61. The anesthesia team and [operating room] staff expressed concern to [Dr. Ives] about [Patient's] instability around 1:00 p.m. and viewed [Dr. Ives] as unresponsive to their concerns about ongoing blood loss and whether there should be another pair of hands to help. (N.T. 38, 41; Exhibits [Peer Review Transcript] and [Expert Report])

62. By 1400 hours, [Patient] had lost 8,000 ccs of blood and six or seven units of packed red blood cells and at least two units of fresh frozen plasma had been transferred. (N.T. 147; Exhibits [Patient's Anesthesia Records], page two of three, and [Peer Review Transcript])

63. At 1400 hours, [Patient] was significantly hypotensive, and the certified nurse anesthetist … called out to [Dr. Ives] to "hold up, hold up," or words to that effect, "we need to catch up." (N.T. 144)

64. [Dr. Ives] stopped and packed [Patient] to give anesthesia a chance to recover and inquired what was going on. (N.T. 144-145)

65. At 1400 hours, one of the nurses in the [operating room] called for platelets. (N.T. 145; Exhibit [Patient's Operating Room Records], p. 3)

9

* * *

68. Most bleeding disorders respond to fresh frozen plasma; when they do not, the individual need[s] platelets. (N.T. 158)

69. Hemostatis was not established for [Patient] during her surgical procedure. (N.T. 39)

* * *

71. [Dr. Ives] got the sigmoid colon, the rectum and the uterus devascularized; by this time, there was only 10-15 minutes left of dissection to completely remove the specimen. (N.T. 155)

72. At approximately [3:00 p.m.], [Dr. Ives] asked the operating room staff to request surgical assistance. (N.T. 43)

73. Platelets still had not arrived. (N.T. 148-149, 158)

* * *

76. At 1515 hours (3:15 p.m.), platelets were ordered a second time; the anesthesia record contains a notation, "Lab stated they will arrive in one & ½ hours." (N.T. 148-149; [Patient's Anesthesia Records], page three of three)

* * *

81. [Patient] was transferred to the [intensive care unit] at Ephrata Community Hospital at [4:20 p.m.] on the day of her surgery.

* * *

83. [Dr. Ives] explained to [Patient's] family that [Patient] had a bleeding disorder and they were doing all they could; [Dr. Ives] explained that [Patient] was given blood and fresh frozen plasma to control the bleeding, but it did not, and that platelets were ordered but they were still waiting for them. (N.T. 159)

* * *

10

91. [Patient] remained in the [intensive care unit] at Ephrata Community [Hospital] for approximately three hours; her death is recorded as occurring at [7:20 p.m.] on December 28, 2012. (N.T. 55; [Patient's Death Certificate])

* * *

93. The immediate cause of death listed on [Patient's] death certificate was bleeding. (Exhibit [Patient's Death Certificate]).

Proposed Adjudication at 8-14, Findings of Fact Nos. 44, 49-50, 53-65, 68-69, 71-73, 76, 81, 83, 91, 93.

With respect to the standard of care, the hearing examiner made the following findings of fact:

107. The appropriate standard of care for a surgeon when [Patient] became unstable from a cardiovascular standpoint during the surgical procedure would have been to pack everything that was bleeding to try to stop the ongoing bleeding, and to allow the anesthesia team to get more intravenous fluids and blood and blood products, and then focus on the hemostasis rather than proceed with what the intent of the operation was to be. (N.T. 51)

108. During [Patient's] surgery, the standard of care would have been to call in another surgeon much earlier than 3:00 p.m. when Dr. Keyser arrived. (N.T. 51-52)

109. [Dr. Ives] departed from, or failed to conform to, standards of acceptable and prevailing medical practice for a surgeon by disregarding the concerns expressed to him by the anesthesia and [operating room] team regarding [Patient's] continued and uncontrolled blood loss during the surgical procedure. (N.T. 48; Exhibit [Expert Report])

110. [Dr. Ives] departed from, or failed to conform to, standards of acceptable and prevailing medical practice for a surgeon by proceeding with the surgical procedure while [Patient] was experiencing uncontrolled bleeding. (N.T. 49-50; Exhibit [Expert Report])

11

Proposed Adjudication at 16-17, Findings of Fact Nos. 107-110. Based on these findings of fact, the hearing examiner concluded that Dr. Ives departed from the accepted standard of care in violation of the Medical Practice Act of 1985.[4] However, she also concluded that leaving Patient in the ICU to perform emergency surgery at another hospital did not constitute abandonment of a patient.[5] Proposed Adjudication at 18, Conclusions of Law Nos. 3-4.

The hearing examiner recommended that Dr. Ives undergo a remedial competency skills assessment by a Board-approved provider and follow any recommendations made in the course of that assessment with respect to additional training. Dr. Ives filed exceptions to the hearing examiner's proposed adjudication and order.

The Board adopted as its own the hearing examiner's findings of fact and conclusions of law. However, it rejected the hearing examiner's recommendation not to impose a public reprimand. The Board held that to protect

---

[4] Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. §§422.1 - 422.51a.

[5] Under the Board's regulations, a practitioner can be subject to disciplinary action for abandonment of a patient. Specifically, Section 16.61(a)(17) of the Board's regulations states, in relevant part, as follows:

> (a) A Board-regulated practitioner who engages in unprofessional or immoral conduct is subject to disciplinary action under section 41 of the act (63 P.S. §422.41). Unprofessional conduct includes, but is not limited to, the following:
>
> * * *
>
> (17) Abandoning a patient. Abandonment occurs when a physician withdraws his services after a physician-patient relationship has been established, by failing to give notice to the patient of the physician's intention to withdraw in sufficient time to allow the patient to obtain necessary medical care. Abandonment also occurs when a physician leaves the employment of a group practice, hospital, clinic or other health-care facility, without the physician giving reasonable notice and under circumstances which seriously impair the delivery of medical care to patients.

49 Pa. Code §16.61(a)(17).

the public and to deter Dr. Ives and other professionals from departing from accepted standards of care, a public reprimand was warranted. It accepted the hearing examiner's recommendation that Dr. Ives complete a remedial clinical competency skills assessment and ordered, *inter alia*, that Dr. Ives' license be automatically suspended should the skills assessment program notify the Board that Dr. Ives did not complete the assessment or cooperate with the program's recommendations.[6]

Dr. Ives petitioned for this Court's review.

**Appeal**

On appeal,[7] Dr. Ives has raised multiple issues.[8] First, he contends that the Board erred in admitting the Peer Review Transcript and in rejecting his hearsay objection to Dr. Kauffman's testimony and expert report for the stated reason that they were based upon the Peer Review Transcript. Second, he contends that the Bureau did not prove he violated the accepted standard of care in providing medical treatment to Patient. Third, he contends that the Board denied him equal protection under the law by treating him differently than other physicians. Fourth, he contends that the Board abused its discretion in ordering a public reprimand, a sanction rejected by its own hearing examiner. Fifth, he contends that the Board denied him

---

[6] The Board's order stated that Dr. Ives' failure to follow the recommendations "of the nationally-recognized comprehensive physician re-education program shall constitute a violation of this Final Order." Board Adjudication, Order ¶15, at 33. Further, should that program "believe" Dr. Ives is not in compliance, its notification to the Board "shall result in the IMMEDIATE TEMPORARY SUSPENSION of [Dr. Ives'] license and [Dr. Ives] shall IMMEDIATELY cease practice in the Commonwealth[.]" *Id.* ¶21, at 33-34.

[7] The Court's review determines whether constitutional rights were violated, an error of law was committed, or necessary findings of fact are supported by substantial evidence. *Stoner v. Bureau of Professional and Occupational Affairs, State Board of Medicine*, 10 A.3d 364, 371 n.4 (Pa. Cmwlth. 2010).

[8] In his appeal, Dr. Ives raises 10 issues. For purposes of this opinion, we have rearranged and combined several of the issues.

13

due process because of the delay between the surgery in 2012 and the Board's adjudication in 2018. Sixth, he contends that the Board lacked authority to suspend his license without a prior hearing should the private third party administering the clinical competency skills assessment and remediation program notify the Board that Dr. Ives was non-compliant.

**Medical Practice Act of 1985**

The practice of medicine is regulated in the Commonwealth of Pennsylvania, and the terms of this regulatory regime are set forth in the Medical Practice Act of 1985. *Tandon v. State Board of Medicine*, 705 A.2d 1338, 1345 (Pa. Cmwlth. 1997) (statutes regulating "the practice of medicine are to safeguard the public health and welfare").

The Board is "charged with the responsibility of overseeing the medical profession and determining the competency and fitness of an individual to practice medicine within the Commonwealth." *Cassella v. State Board of Medicine, Bureau of Professional and Occupational Affairs*, 547 A.2d 506, 512 (Pa. Cmwlth. 1988). Pertinent here, Section 41(8)(ii) of the Medical Practice Act of 1985 authorizes the Board to "impose disciplinary or corrective measures on a board-regulated practitioner" where:

> (ii) *A practitioner departs from, or fails to conform to, a quality standard of the profession when the practitioner provides a medical service at a level beneath the accepted standard of care.* The board may promulgate regulations which define the accepted standard of care. In the event the board has not promulgated an applicable regulation, the accepted standard of care for a practitioner is that which would be normally exercised by the average professional of the same kind in this Commonwealth under the circumstances, including locality and whether the practitioner is or purports to be a specialist in the area.

14

63 P.S. §422.41(8)(ii) (emphasis added). With this background, we turn to Dr. Ives' appeal.

## Analysis

### I.

In his first issue, Dr. Ives argues that the Board erred in relying upon the Peer Review Transcript to make findings of fact about what happened to Patient in the operating room. The Board did not see or hear the persons who testified in Ephrata Community Hospital's peer review proceeding, which was private and conducted for a specific, but different, purpose. Dr. Ives' peers did not produce a report that evaluated the evidence presented. Stated otherwise, it is impossible to know what credibility determinations they made on the basis of witness demeanor or whether they accepted any of the witnesses' interpretations. Dr. Ives contends that the Board erred in using out-of-court statements in lieu of conducting its own evidentiary hearing. Dr. Kauffman's testimony and report were likewise tainted by his consideration of the Peer Review Transcript to render an expert medical opinion.

The Peer Review Transcript contains testimony given by doctors, nurses, and other medical staff about the surgery in question and their interpretations of the events that transpired. The Bureau offered the transcript into evidence for the purpose of establishing what happened in the operating room so that Dr. Kauffman could opine about whether Dr. Ives' conduct of the surgery fell below the accepted standard of care. The parties acknowledge that the transcript is hearsay, which "is a statement that '(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" *Ray v. Civil Service Commission of Borough of Darby*, 131 A.3d 1012, 1022 (Pa. Cmwlth. 2016).

15

As the Board observes, the rules of evidence are relaxed in administrative proceedings where "all relevant evidence of reasonably probative value may be received." 2 Pa. C.S. §505. With regard to the use of hearsay in administrative proceedings, it has long been established as follows:

> (1)     Hearsay evidence, [p]roperly objected to, is not competent evidence to support a finding of the Board[;]
>
> (2)     Hearsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of the Board, if it is corroborated by any competent evidence in the record, but a finding of fact based [s]olely on hearsay will not stand.

*Walker v. Unemployment Compensation Board of Review*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976). These strictures on the use of unobjected to hearsay are known as the "*Walker* rule."

Conceding that the Peer Review Transcript is hearsay, the Board argues that it can be given probative value in an administrative hearing in accordance with the *Walker* rule. We disagree. Dr. Ives specifically objected to the admission of the Peer Review Transcript on grounds of hearsay. The *Walker* rule is inapplicable because it applies only where hearsay evidence has been admitted without objection. It has no application where, as here, hearsay evidence has been admitted over the objection of a party.

The Board held, in the alternative, that the Peer Review Transcript was admissible under the "'Former Testimony' exception to the hearsay rule at [Pennsylvania Rule of Evidence] 804(b)(1)." Board Adjudication at 8. Rule 804(b)(1) states, in relevant part, as follows:

> The following are not excluded by the rule against hearsay *if the declarant is unavailable as a witness*:

16

(1) *Former Testimony.* Testimony that:

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

> (B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

PA. R.E. 804(b)(1) (emphasis added). The former testimony exception applies when the declarant is unavailable.[9] The Board acknowledged this limitation in its adjudication but dismissed the "unavailability of a declarant" requirement as serving "no useful purpose in an administrative proceeding where the objective is to adjudicate issues in an expeditious manner." Board Adjudication at 9, n.13. The lapse of six years between the incident and the Board's adjudication belies this rationalization.

---

[9] A declarant is unavailable as a witness if the declarant:
(1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies;
(2) refuses to testify about the subject matter despite a court order to do so;
(3) testifies to not remembering the subject matter, except as provided in Rule 803.1(4);
(4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or
(5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:
> (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or
> (B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

But this paragraph (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying.
PA. R.E. 804(a).

17

The record offers no support for the position that any of the witnesses who appeared in the peer review hearing were unavailable to testify at the Board hearing or to provide a deposition. We reject the Board's contention that the Peer Review Transcript is admissible under Pennsylvania Rule of Evidence 804(b)(1); the "unavailability of a declarant" is essential to this hearsay exception and not optional, as the Board believed.

Likewise, the Peer Review Transcript was not admissible as a business record of Ephrata Community Hospital. Section 6108(b) of the Uniform Business Records as Evidence Act states as follows:

> (b) General rule.--A record of an act, condition or event shall, insofar as relevant, be competent evidence *if the custodian or other qualified witness testifies to its identity and the mode of its preparation,* and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa. C.S. §6108(b) (emphasis added). Notably, "it is not essential to produce either the person who made the entries or the custodian of the record at the time the entries were made…." *Virgo v. Workers' Compensation Appeal Board (County of Lehigh-Cedarbrook)*, 890 A.2d 13, 20 (Pa. Cmwlth. 2005). However, the "authenticating witness" must provide information about the preparation and maintenance of the records to justify a presumption of trustworthiness "to offset the hearsay character of the evidence." *Id.* at 20.

The Peer Review Transcript does not constitute a business record of what happened in the operating room. Even so, an authenticating witness was needed in order to have the transcript admitted. Connolly, who obtained the transcript by subpoena, lacked any knowledge about the preparation or subsequent

18

maintenance of the transcript. For this reason alone, the Peer Review Transcript was not admissible as a business record.

Finally, the Board argues that the Peer Review Transcript was an admissible hospital medical record. The Judicial Code states, in relevant part, as follows:

> *Medical charts or records* of any health care facility licensed under the laws of this Commonwealth … may be proved as to foundation, identity and authenticity without any preliminary testimony, by use of legible and durable copies, *certified in the manner provided in this subchapter by the employee of the health care facility charged with the responsibility of being custodian of the originals thereof*.

42 Pa. C.S. §6151 (emphasis added). For a record to be "certified" requires the custodian of the records to sign a certification before a notary public. 42 Pa. C.S. §6152(d).[10]  Assuming, *arguendo*, that the Peer Review Transcript is a "medical chart" or a "medical record," it lacks a certification from the custodian of records for Ephrata Community Hospital. Because the Peer Review Transcript is not

---

[10] It states:
> (d) Certification.--*The certification shall be signed before a notary public by the employee of the health care facility charged with the responsibility of being custodian of the records* and shall include the full name of the patient, the patient's medical record number, the number of pages in the medical records and a legend substantially to the following effect:
>> "The copies of records for which this certification is made are true and complete reproductions of the original or microfilmed medical records which are housed in (name of health care facility). The original records were made in the regular course of business at or near the time of the matter recorded. This certification is given pursuant to 42 Pa.C.S. Ch. 61 Subch. E (relating to medical records) by the custodian of the records in lieu of his personal appearance."
> Copies shall be separately enclosed and sealed in an inner envelope or wrapper bearing the legend "Copies of Medical Records."

42 Pa. C.S. §6152(d) (emphasis added).

authenticated or certified, it does not pass the threshold for having a document admitted under 42 Pa. C.S. §6151.

The Peer Review Transcript is hearsay, and it was not admissible by reason of the *Walker* rule or under any recognized exception to the hearsay rule. Nor was it properly authenticated. For these reasons, the Board erred in admitting the Peer Review Transcript into evidence to prove what happened in the operating room.

**II.**

Dr. Ives challenges the admissibility of Dr. Kauffman's testimony and opinion. Dr. Kauffman did not base his opinion strictly on Patient's medical records but also upon the Peer Review Transcript. Dr. Ives argues that Dr. Kauffman's reliance on this inadmissible hearsay rendered his opinion incompetent.[11] The Board responds that experts may rely upon information that is not admitted into evidence to develop their expert opinion. Accordingly, it contends that Dr. Kauffman could rely on the Peer Review Transcript even if it was not properly admitted into evidence at the administrative hearing.

As a general rule, experts may rely upon reports not admitted into evidence to render an expert opinion. In adopting this principle, our Supreme Court explained:

> In Pennsylvania, our cases have heretofore ruled that an expert may not state a conclusion which is based on evidence not in the record…. However, several jurisdictions influenced by the teaching of highly regarded legal commentators have recognized an exception to this rule and have permitted medical witnesses to express opinion testimony on medical matters based, in part,

---

[11] Dr. Ives also challenges the competency of Dr. Kauffman's opinion because he did not review Patient's postoperative records from the ICU or Dr. Ives' orders during the surgery. Ives Brief at 37.

20

upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession….

As Professor Wigmore explains, "where the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this."….

It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania.

*Commonwealth v. Thomas,* 282 A.2d 693, 698-99 (Pa. 1971) (citations and quotation omitted). "The rule from *Thomas* is codified in [Pennsylvania Rule of Evidence] 703." *City of Philadelphia v. Workers' Compensation Appeal Board (Kriebel)*, 29 A.3d 762, 770 n.12 (Pa. Cmwlth. 2011). Pennsylvania Rule of Evidence 703 states as follows:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. *If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.*

PA. R.E. 703 (emphasis added). In short, an expert opinion may be based on "hearsay statements, as long as such facts are of a type reasonably relied on by experts in that profession used to form an opinion." *Carletti v. Department of Transportation*, 190 A.3d 766, 778 (Pa. Cmwlth. 2018).

Our Superior Court has explained the reason for this exception as follows:

An expert's opinion may be based upon years of professional experience, schooling and knowledge, not all of which can be presented on a first-hand basis in court. Moreover, … the expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert

21

> regularly relies on and uses similar data in the practice of his or her profession. The kind of data contemplated by the rule is often … the kind of data used daily by experts in making judgments, reaching diagnoses, and taking action.
>
> ***
>
> *The fact that experts reasonably and regularly rely on this type of information merely to practice* their profession *lends strong indicia of reliability to source material*, when it is presented through a qualified expert's eyes.

*Primavera v. Celotex Corporation*, 608 A.2d 515, 519-20 (Pa. Super. 1992) (emphasis added).

Dr. Ives argues the Bureau did not lay the foundation for the Peer Review Transcript that is required by Rule of Evidence 703. Specifically, Dr. Kauffman did not testify that he regularly relies upon transcripts of peer review proceedings in his medical practice. He did not testify that experts in his field reasonably and regularly rely upon this type of material to make a medical judgment. Absent this foundation, the Peer Review Transcript lacks the requisite "strong indicia of reliability." *Id*. at 520.

The Board responds that Dr. Kauffman was qualified as an expert, and he testified that he used the Peer Review Transcript to render his opinion. It follows, therefore, that the Peer Review Transcript is the type of information that experts rely upon. We reject this tautology.

This Court has explained that an expert may rely on information made known to the expert at or before the hearing, so long as "the information itself is admissible or is of a type reasonably relied upon by experts in the field." *Readinger v. Workers' Compensation Appeal Board (Epler Masonry)*, 855 A.2d 952, 956 (Pa. Cmwlth. 2004) (citing PA. R.E. 703). Physicians often base their diagnoses on information obtained from other sources, such as patient statements, "nurses'

22

reports, hospital records, and laboratory tests." *Woodard v. Chatterjee*, 827 A.2d 433, 444 (Pa. Super. 2003). As our Supreme Court has noted:

> [W]here the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this.

*Thomas*, 282 A.2d at 699 (quotation omitted). However, the Peer Review Transcript goes far beyond Patient's records, laboratory tests and the observations of attending nurses.

The Bureau did not present evidence that surgeons regularly rely upon and use peer review transcripts. Dr. Kauffman did not testify that he regularly relies on this type of material. Simply, the record does not establish that, as a general rule, surgeons rely on transcripts from peer review proceedings to formulate their medical opinions. Although medical experts rely upon reports of other physicians, the Peer Review Transcript is not a medical report that recorded contemporaneous medical observations of a patient.

The Bureau failed to establish that the Peer Review Transcript is the type of report customarily relied on by surgeons to form an opinion. Absent that proof, Dr. Kauffman's opinion lacked a foundation, which was necessary to the formation of a competent expert opinion. Therefore, the Board erred in relying upon Dr. Kauffman's expert report and testimony to make findings on whether Dr. Ives' treatment of Patient departed from the accepted standard of care.

### III.

Dr. Ives argues that the Bureau did not make its case for any discipline. The only evidence it offered in support of the factual finding that Dr. Ives departed from the accepted standard of care was Dr. Kauffman's opinion. Once that expert

opinion is rejected as not competent, the record lacks the evidence necessary to support the Board's legal conclusion that Dr. Ives violated the Medical Practice Act of 1985.

Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support [a] conclusion." *Taterka v. Bureau of Professional and Occupational Affairs*, *State Board of Medicine*, 882 A.2d 1040, 1044 n.4 (Pa. Cmwlth. 2005). "In reviewing the record for substantial evidence, this Court is required to review the record as a whole." *M.H. v. Department of State, Bureau of Professional and Occupational Affairs, State Board of Social Workers, Marriage and Family Therapists and Professional Counselors* (Pa. Cmwlth., No. 2036 C.D. 2008, filed January 12, 2010) (unreported), slip op. at 10. In looking at the entire record, "this Court examines the testimony in the light most favorable to the prevailing party." *MKP Enterprises, Inc. v. Underground Storage Tank Indemnification Board*, 39 A.3d 570, 579 (Pa. Cmwlth. 2012).

The Bureau used its expert, Dr. Kauffman, to establish what happened during the surgery, and this was error. *Carletti*, 190 A.3d at 778 (expert opinion does not prove the facts necessary to support the opinion). Dr. Kauffman's understanding of the surgery came from his review of some of Patient's medical records and the Peer Review Transcript. To the extent the Board's findings on what happened during Patient's surgery are based upon Dr. Kauffman's opinion and the Peer Review Transcript, those findings are not supported by substantial evidence.

Nevertheless, the Board made some findings of fact based solely upon Patient's hospital records and Dr. Ives' testimony related thereto. These findings are supported by substantial evidence. However, these findings do not support the

24

Board's conclusion that Dr. Ives departed from the accepted standard of care in providing medical treatment to Patient.

The Board found that two and one-half hours into surgery, Patient experienced bleeding. Proposed Adjudication at 8-9, Finding of Fact No. 44. Dr. Ives ordered red blood cells be administered to Patient. *Id*. at 10, Finding of Fact No. 54. Then, at 11:30 a.m., Dr. Ives verbally ordered that two units of packed red blood cells be "typed & crossed @ all times." *Id*., Finding of Fact No. 55. At 12:15 p.m., Dr. Ives gave verbal orders for fresh frozen plasma. *Id*. at 11, Finding of Fact No. 58. When Dr. Ives testified that the anesthesia team called out to him to "hold up," indicating its need "to catch up," he stopped operating. *Id*., Findings of Fact Nos. 63, 64, at 11. These factual findings do not support the conclusion that Dr. Ives' care of Patient fell below the requisite standard of care. They do not show that he disregarded concerns brought to his attention by others in the operating room.

The Peer Review Transcript was inadmissible. Dr. Kauffman's opinion did not establish that Dr. Ives' care of Patient fell below the accepted standard of medical care because that opinion was based, in part, upon the Peer Review Transcript. The Board's remaining findings of fact based only on Patient's records and Dr. Ives' testimony do not support the finding that Dr. Ives' care of Patient fell below the accepted standard of care. Consequently, the Board's conclusion that Dr. Ives provided a medical service beneath the accepted standard of care in violation of Section 41(8)(ii) of the Medical Practice Act of 1985, 63 P.S. §422.41(8)(ii), cannot stand.

25

## Conclusion

For all the reasons set forth above, we reverse the adjudication of the Board.[12]

_____
MARY HANNAH LEAVITT, President Judge

---

[12] Because we hold that the Board's findings of fact on the accepted standard of care are not supported by substantial evidence, we need not address the other issues Dr. Ives has raised on appeal.

26

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

William L. Ives, M.D.,                         :
                    Petitioner                 :
                                               :
         v.                                    : No. 646 C.D. 2018
                                               :
Bureau of Professional and                     :
Occupational Affairs, State                    :
Board of Medicine,                             :
                    Respondent                 :

# **O R D E R**

AND NOW, this 28th day of February, 2019, the adjudication of the State Board of Medicine, in the above-captioned matter, dated April 13, 2018, is REVERSED.

_____
MARY HANNAH LEAVITT, President Judge