# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Appeal of | : | |
| Ridge Park Civic Association | : | |
| | : | No. 1311 C.D. 2023 |
| From the Decision of: | : | No. 1658 C.D. 2023 |
| Zoning Board of Adjustment | : | SUBMITTED: November 6, 2025 |
| | : | |
| Appeal of: Ridge Park Civic | : | |
| Association | : | |

BEFORE:   HONORABLE ANNE E. COVEY, Judge
　　　　　　 HONORABLE MICHAEL H. WOJCIK, Judge
　　　　　　 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## <u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**　　　　　　　　　**FILED:  December 22, 2025**

Objector, Ridge Park Civic Association, appeals from an order of the Court of Common Pleas of Philadelphia County affirming the decision of the City of Philadelphia's Zoning Board of Adjustment, which, once again, granted the application for use and dimensional variances filed by Applicants, David Henderson and Pasquale Binaculli, for a multi-family residential housing project located at 6995 and 6997 Pechin Street in the City's Roxborough section.  The present appeal follows *In re Appeal of Ridge Park Civic Association*, 240 A.3d 1029 (Pa. Cmwlth. 2020) (*Ridge Park I*) and *In re Appeal of Ridge Park Civic Association* (Pa. Cmwlth., No. 1159 C.D. 2020, filed February 24, 2022) (*Ridge Park II*), where we, respectively, twice remanded the matter to the trial court to afford Applicants an opportunity to establish that nine units and no fewer satisfied the minimum variance criteria.  We affirm.[1]

---

[1] The City has been precluded from filing a brief.  6/09/2025 Cmwlth. Ct. Order.

Then, as now, Applicants seek to build three structures, with three units in each structure, on two lots in an RSA-2 Residential (residential single-family attached-2) zoning district where the Philadelphia Zoning Code (Zoning Code) permits only one principal structure per lot and prohibits multi-family use. Zoning Code § 14-401(4)(a). In addition to dimensional variances, they also applied for a use variance to build nine units. At the Board's May 2018 hearing, Applicants sought to establish undue hardship due to the property's unique circumstances. These included an elongated shape with narrow frontage and geotechnical issues necessitating a costly constructive foundation consisting of a pillar-pier foundation system. Objector's representative testified that four units would be appropriate and the City Planning Commission's representative opined that nine units would be an overuse.

The Board unanimously voted to grant the application, affording great weight to the undisputed evidence of the cost of addressing the challenging geotechnical issues and concluding that nine units satisfied the minimum variance criterion. *Ridge Park I*, 240 A.3d at 1037. It also focused on the qualitative factor that the proposed use would remain residential. *Id*. The trial court affirmed without taking additional evidence, stating that the minimum variance criterion was inapplicable to use variances despite the Zoning Code's provision to the contrary. *Id*. at 1031.

This Court in *Ridge Park I* vacated the trial court's order and remanded for further proceedings. Noting that Applicants sought a change in the intensity of the permitted residential use of the property but not a change in the nature of the permitted use, we stated that once the Board concluded that a use variance was necessary to enable the viable economic use of the property under the applicable

2

provision of the Zoning Code, it had to ascertain the extent of any variance authorized. *Ridge Park I*, 240 A.3d at 1035. We detailed the Board's inquiry:

> Unlike the cases in which a use variance entails only a qualitative departure from the terms of the ordinance, this case . . . involves a quantifiable departure. *Here, such a determination entailed ascertaining how many units were necessary for Applicants to build given the cost of developing in an area with undisputed geotechnical issues. In other words, the inquiry required resolution of the factual issue of a reasonable profit and the minimum number of units necessary for it to be economically feasible to proceed*.

*Id*. (emphasis added).

In ascertaining the adequacy of what was done, we stated:

> The Board's factual findings are fully supported and the record makes clear that the property could not be viably developed in accordance with the strict terms of the Zoning Code. Moreover, the factors it cited are clearly relevant and would provide support for its conclusion that the variances are the minimum necessary if they were of the sort lacking any quantifiable measure. *Here, however, in addition to the pertinent qualitative factors, the necessary departure from the measurable requirements must also be established. The trial court did not take additional evidence to amplify the record, apparently because of its erroneous view that the minimization doctrine did not apply to use variances. Given the costs inherent in such a project, including the purchase price and engineering costs related to challenging geotechnical issues, as well as the extraordinary costs for the necessary helical piers, it does not seem unlikely that nine units is the minimum number needed to afford relief. Similarly, the testimony that the farther from the road the townhomes were placed, the deeper the bore for the piers would have to go and the more earth that would have to be displaced,*

3

*the reduced setback may well be justified. However, we cannot substitute our guess as to what is likely for actual proof.*

*Ridge Park I*, 240 A.3d at 1037-38 (emphasis added).

Accordingly, we "remand[ed] to the trial court to make appropriate findings as to the quantitative aspects of the minimum variances necessary for this to be a viable project." *Ridge Park I*, 240 A.3d at 1038. In other words, ascertain whether exactly nine units satisfied the Zoning Code's requirement that "[t]he variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation at issue[.]" *Id*. at 1032. Mindful that "the minimum variance criterion is more readily and practically applicable to quantifiable restrictions, such as dimensional requirements . . . , rather than those that are not quantifiable, as are most use restrictions (i.e., types of development)[,]"[2] we nonetheless directed that a factual determination be made based on actual proof that nine units was the minimum number needed to afford relief and that the dimensional variances were justified. *Id*. at 1037. We reiterated that "whether an applicant satisfies the minimum variance criterion is fact dependent and grounded in an analysis as to whether the accepted evidence constitutes substantial evidence." *Id*. at 1034.

The trial court once again affirmed without taking additional evidence, reasoning that the existing record was complete and that there was substantial evidence to support the determination that the granted variances were the minimum necessary to afford relief. Objector's second appeal to this Court followed.

In *Ridge Park II*, the focus was on our remand in *Ridge Park I* and whether the trial court responded appropriately. In concluding that Applicants failed to meet

---

[2] *Ridge Park I*, 240 A.3d at 1033-34 (citation omitted).

their burden, we noted their acknowledgement that there was no perfect testimony in the then-existing record that nine units was the least minimum variance. In addition, we held that the testimony that the trial court cited as support for its statement that the foundation would cost the same amount, no matter how many units were built, was not the equivalent of evidence that nine units constituted the least minimum variance. The testimony in question provided:

> **Mr. Pollock [Applicants' counsel]**: [T]alking about utilities and everything, do the utilities present a challenge for this development, whether it be one house or whether it be nine homes?
>
> **Mr. Daniel Pellicciotti [general contractor]**: The utilities also will sit on these helical piers. There'll be a channel cut out and there'll be like a concrete encasement, and then a concrete encasement will actually sit on the helical piers and the gas, electric, sewer will run through.
>
> **Mr. Pollock**: Okay. And that is something that also involves a little bit of engineering. Isn't that correct?
>
> **Mr. Pellicciotti**: A lot of engineering.
>
> **Mr. Pollock**: Okay. And that's something that if you were to build the two homes that might be allowed as of right, you'd have to do this --
>
> **Mr. Pellicciotti**: Right.
>
> **Mr. Pollock**: -- with the helical piers and channeling out for utilities. Is that correct?
>
> **Mr. Pellicciotti**: That's correct.

May 17, 2018 Hr'g, Notes of Testimony (N.T.) at 46-47.

Moreover, even though Pellicciotti acknowledged that the utilities would present a challenge whether the project encompassed two or nine units, we noted

5

that he did not testify that the number of units was irrelevant to the cost. He testified that the proposed development for 9 units would require a total of 147 piers at $6,800 per pier, and that the costs just for the piers and foundations would be a little less than $1.135 million. May 17, 2018 Hr'g, N.T. at 44. When pressed as to whether fewer piers would be required for fewer homes, Pellicciotti failed to answer.

While the effort and cost for the utilities might be the same for two or nine homes, we held that such evidence did not prove that nine constituted the least minimum variance. We noted that the trial court's attempt to bootstrap Pellicciotti's testimony in determining that Applicants met their burden reflected our struggle in *Ridge Park I*, which led to our determination that they did not conclusively prove that nine units was the minimum number to afford relief despite establishing the many challenges in developing the lots. Accordingly, holding that Applicants could not meet their burden with the requisite substantial evidence absent actual and more precise proof on that quantitative issue, we remanded a second time. We reiterated that Applicants had to present the necessary expert testimony and evidence "required [for] resolution of the factual issue of a reasonable profit and the minimum number of units necessary for it to be economically feasible [for the project] to proceed." *Ridge Park II*, slip op. at 7 (quoting *Ridge Park I*, 240 A.3d at 1035).

Subsequently, the trial court remanded the matter to the Board "with instruction limited only to create a record and issue a Supplemental Decision on the issue of whether [Applicants] have established a [m]inimum [v]ariance in accordance with [*Ridge Park II*]." 4/06/2022 Trial Ct. Order; Reproduced Record (R.R.) at 225a. Following remand hearings in 2022, the Board issued Supplemental Findings of Fact and Conclusions of Law in support of its decision to affirm its prior

grant of the requested variances. The trial court affirmed and Objector's appeal to this Court followed.

## I.

Objector argues that the Board erred in granting variances without expert testimony on the quantitative number of units necessary for an economically feasible project, contending that the trial court erred in interpreting *Ridge Park I* and *Ridge Park II* as not requiring expert testimony. Objector further argues that the trial court erred in rationalizing that no expert testimony was necessary because the Board is not bound by the technical rules of evidence. *See* Section 554 of the Local Agency Law, 2 Pa.C.S. § 554 ("Local agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received."). Accordingly, Objector maintains that the evidence that Applicants proffered at the 2022 remand hearings (Henderson's testimony and summary on the project's profitability, as well as Pellicciotti's testimony), does not constitute the requisite proof.

As an initial matter, the trial court has conflated the necessity for expert testimony with the fact that there are relaxed rules of evidence for agency hearings. The fact that a local agency is not bound by the technical rules of evidence does not mean that the requisite expert testimony is not required to support determinations requiring such testimony. To reiterate, we held that Applicants needed to present actual and more precise proof, by way of expert testimony and evidence, that nine units was the minimum number to afford relief.

Neither Henderson nor Pellicciotti was offered as a per se expert and Applicants' counsel did not go through the formality of introducing their testimony as expert testimony. Nonetheless, counsel elicited their backgrounds and the basis

for them to render opinions on the issue at hand. Henderson testified in his capacity as the applicant/owner "about the substantial costs to bring this project to bear, as well as the estimated out-sale cost of the completed homes." Board's Suppl. Findings of Fact (F.F.) and Conclusions of Law (C.L.), C.L. No. 6. "While Mr. Henderson was not offered as an expert in construction estimation, he noted his involvement with other construction projects, his possession of [a master's degree in business administration], and his consultation with experts in different industries to prepare the analysis he presented to the Board." *Id*. One of the construction experts was Pellicciotti, who provided Henderson with one of the three general construction estimates that he used to prepare the analysis that he presented to the Board. F.F. No. 41. Pellicciotti testified based on his background as the owner of a construction company, noting that he had constructed approximately 130 homes in the area.[3] F.F. Nos. 41, 42. In addition, Pellicciotti is the general contractor for the proposed project.

It is well established that

> [t]he test to be applied when qualifying a witness to testify as an expert witness is whether the witness has any reasonable pretention to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.

*Carpenter v. Pleasant*, 759 A.2d 411, 415 (Pa. Cmwlth. 2000) (citations omitted). Accordingly, while Applicants' counsel did not specifically qualify Henderson and Pellicciotti as experts, it was reasonable for the Board to consider and weigh their

---

[3] Notably, we never held that Pellicciotti's testimony did not constitute expert testimony. We simply rejected the trial court's earlier attempt to bootstrap his testimony that the many challenges in developing the lots automatically supported a determination that nine units constituted the least minimum variance.

respective testimony pertaining to the narrow scope of "the whole nine-unit issue."
F.F. No. 20.

We turn next to determining whether the evidence Applicants proffered constituted the requisite substantial evidence for resolution of the factual issue that nine units was the minimum number to afford relief.

Henderson testified that he conducted an analysis to ascertain and explain why nine units constituted the minimum number to overcome the hardship presented by the property. As part of his research, he spoke to his financial people, two real estate agents, and two construction experts.[4] 6/01/2022 Hr'g, N.T. at 6; R.R. at 238a. Henderson then proceeded to testify why the analysis supported his position.

Turning to the construction experts, Henderson obtained three estimates in preparing his analysis with the key data point being the cost per square foot. F.F. No. 22. Using the median value of $220 per square foot per unit, Henderson "added capital holding costs plus the price to clear the land to arrive at the total cost of construction." F.F. No. 23. In rendering his calculations, "Henderson listed several sub data points that impact the various costs including inflation, the housing market, rising interest rates, supply chain volatility, and raw material costs." F.F. No. 24. Henderson stated that, "if you're looking at the price per square foot being $462,000

---

[4] "As a general rule, experts may rely upon reports not admitted into evidence to render an expert opinion." *Ives v. Bureau of Pro. & Occupational Affs.*, 204 A.3d 564, 576 (Pa. Cmwlth. 2019) (citation omitted). In addition:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If the experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

*Id.* at 577 (quoting Pa.R.E. 703).

to build the homes, and inflation last quarter was eight and a half percent --I put there, it's likely to increase to $500,000 in the current market." 6/01/2022 Hr'g, N.T. at 12; R.R. at 244a (F.F. No. 25).[5] In addition, Henderson acknowledged that the unit price could be reduced by eliminating basements but stated that helical piers would still be required even with slab on-grade construction and that the lack of a basement could impact the marketability of the units. F.F. No. 29.

When Henderson was questioned as to whether he undertook an analysis for two or four homes, with single-family homes in those zip codes allegedly selling for $800,000, he testified that he conducted an analysis for one, two or four homes. F.F. No. 35. He testified that he would lose money under those scenarios due to the unique soil circumstances that must be alleviated and fixed before construction. *Id.*

Acknowledging that the calculations indicate that the project could lose money or break even, Henderson stated that he nonetheless wanted to proceed as a member of the community, that the market could stabilize with time, that the loss on nine units is from his most conservative estimates, and that he would be able to turn a profit with the ninth unit if things improve. F.F. Nos. 26-28. Opining overall that his calculations showed that the proposed development would not be financially viable with fewer than nine units, Henderson testified that he would lose money if he developed seven or eight units using the least conservative of the estimated construction costs and that he was already operating at a loss due to the holding costs and costs in maintaining the site. F.F. No. 32.

Turning to the estimated sale price of the units, Henderson stated that he had spoken with two real estate agents in preparing his cost summary and had a broadly

---

[5] Clearly, since in answer to the previous question Henderson had stated that he was using a cost of $220 per square foot, what Henderson was saying in this response was that using his previously stated cost per square foot, each *unit* would cost $462,000 to $500,000 to construct.

worded letter from a realtor but no official document confirming an estimated market value of $516,222 per unit. F.F. No. 34. By way of explanation, Henderson stated that there were a lot of variables going into what a unit would look like, the market conditions at the time, and the inventory on the market. *Id*. In arriving at $516,222, he used a property of similar size and scope two houses down from the proposed project and "took the 2018 out-price and just used inflation to show what it could sell for now." F.F. No. 30. He characterized his estimate as conservative. F.F. No. 31. He concluded that he could take you through the neighborhood, block by block, and show you units that had sold for less than $515,000 and ones that had sold for more, noting that "[t]here's a lot of variables that go into how those units sell in comparables; it's part art, part science." F.F. No. 39.

As for Objector's attempt to discredit Henderson's use of the Consumer Price Index (CPI) as a means to calculate the present out-sale cost of the proposed units, the Board concluded:

> Regardless of whether the methodology was proper, [Objector] failed to present any persuasive evidence that Mr. Henderson's calculation provided an erroneous result that substantially affected his overall analysis as well as his conclusion that nine homes are needed for this project to be profitable.

C.L. No. 15.[6]

---

[6] Objector argued that Applicants undervalued the out-sale cost of the proposed units and attempted to rebut their evidence with Ms. Christine Ertz's testimony. C.L. No. 11. The Board did not find Ertz's testimony to be credible, noting that she only had four years of experience in real estate, that she was a member of Objector's organization, and that the information she presented was contradictory and minimal. C.L. No. 14. Nonetheless, Objector continues to cite Ertz's testimony on appeal to this Court. Objector's Br. at 23-24. Given the fact that the Board rejected her testimony as not credible, we decline to consider it.

Turning to general contractor Pellicciotti, he testified that it would not be economically feasible for Applicants to develop the project with fewer than nine homes and that "you [only] start making a profit halfway through the eighth home." 6/01/2022 Hr'g, N.T. at 44; R.R. at 276a. In response to a question as to whether he had conducted a cost analysis for a detached single-family home on each of the two lots at issue, Pellicciotti stated:

> We would still have to do 90[%] of the work that we would have to do for nine homes. So it's not feasible . . . . I brought an engineer in and we discussed it together . . . . He said, Dan, we have to stabilize the whole area in order for you to build one big home. [N.T.] at 47-48, 51.

F.F. No. 45.

As for helical piers, Pellicciotti "explained that while the number of helical piers needed may vary based on the number of houses constructed at the property, the entire property would need to be dug out and backfilled regardless of the number of homes built, resulting in a fixed cost for the project. [N.T.] at 48-51." C.L. No. 8. He explained that, once you disturb the soil, it all has to come out. F.F. No. 46. "[W]e have to put piers in all the way around, back-fill it with clean fill and remove the ash that's in there [from the property being used as a dump site for ash in the 1950s]."[7] F.F. No. 46. As a result, "the price is the same no matter if you build the one home, as far as the . . . infrastructure, or you build nine." *Id*. "Pellicciotti also confirmed Mr. Henderson's statements concerning the increase in construction costs in recent years and current supply chain volatility. [N.T.] at 45-47." C.L. No. 9.

The Board found the testimony of Henderson and Pellicciotti to be credible, stating that "their testimony was persuasive as to nine units being the minimum

---

[7] N.T. at 44; R.R. at 276a.

number to result in the project turning a profit." C.L. No. 10. It was within the Board's purview as the arbiter of fact to weigh their testimony and rule on credibility. *Nettleton v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 828 A.2d 1033, 1041 n.10 (Pa. 2003). We decline to disturb the Board's determination on appeal.

## II.

Objector next asserts that the Board erred in issuing variances for an allegedly financially unviable project based on Applicants' speculation on potential future economic conditions.

Objector's argument constitutes an attack on the Board's role in assessing witness credibility and weighing the evidence. While it is true that Henderson testified that Applicants could lose money on the project, he replied as follows in response to why he continued to want to go forward with the project: "I'm a member of this community. I want to do something that makes sense and is appropriate. But it's okay to be patient and it's okay to, you know, to see if the market stabilizes. The factors that I list above there, and the factors that I cite in my references [e.g., inflation, interest rates, supply chain volatility, raw material costs, and the holding costs for capital], those could stabilize over time." F.F. No. 27. Henderson also testified that the analysis that he conducted established that the project would turn a profit with the sale of the ninth home. F.F. Nos. 28 and 32. Accordingly, Objector's argument is without merit.

## III.

Objector further contends that the Board erred in concluding that the variances sought were the minimum necessary to afford relief when Applicants purportedly admitted that they did not consider any development other than one with nine units as originally proposed.

13

The question is not whether Applicants considered any development other than one with nine units. The question is whether they were able to prove that nine units was the minimum number to afford relief. While an alleged failure to consider a development with fewer units might factor into a determination as to whether they met their burden of proof, it is not determinative of a failure to do so. Consequently, we find Objector's "gotcha" argument in this regard to be somewhat misleading.

In any event, Henderson testified that he calculated the cost of building either one, two, or four homes on the two lots. F.F. No. 35. Stating that there were unusual and unique soil circumstances that would have to be alleviated before construction, he testified that they would lose a lot of money building fewer homes. *Id.* Pellicciotti also testified regarding the economic feasibility of building fewer than nine units. In addition to concluding that there were certain fixed costs regardless of the number of units, he opined that there would be no profit until half-way through the eighth home.

## IV.

There was substantial evidence upon which the Board could conclude that Applicants met their burden of establishing that nine units was the minimum number to afford relief. Accordingly, we affirm.

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of : 
Ridge Park Civic Association :
  : No. 1311 C.D. 2023
From the Decision of: : No. 1658 C.D. 2023
Zoning Board of Adjustment :
  :
Appeal of: Ridge Park Civic :
Association :

# **O R D E R**


    AND NOW, this 22nd day of December, 2025, the order of the Court of Common Pleas of Philadelphia County is hereby AFFIRMED.


                      **BONNIE BRIGANCE LEADBETTER,**
                      President Judge Emerita