John Kline, :
              Petitioner :
               :
        v. :
               :
Pennsylvania Public :
Utility Commission, : No. 918 C.D. 2024
              Respondent : Submitted: October 7, 2025


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MATTHEW S. WOLF, Judge


OPINION BY
JUDGE COVEY                            FILED: January 22, 2026


       John Kline (Petitioner), *pro se*, petitions this Court for review of the Pennsylvania Public Utility Commission's (Commission) October 8, 2020 Final Order (Final Order) denying Petitioner's Exceptions to the Administrative Law Judge's (ALJ) Initial Decision that dismissed Petitioner's formal complaint against PPL Electric Utilities Corporation (PPL) (Complaint), and the Commission's May 23, 2024 order denying Petitioner's Petition for Reconsideration (Reconsideration Order). There are five issues before this Court: (1) whether the Commission erred by concluding that Act 129 of 2008[1] (Act 129) required electric distribution companies (EDCs) to install an Advanced Metering Infrastructure (AMI) smart meter at Petitioner's property; (2) whether the Commission may deny Petitioner the opportunity for a substitute meter under Section 1501 of the Public Utility Code (Code);[2] (3) whether the Commission erred by granting PPL's Exceptions while

---

[1] Act of October 15, 2008, P.L. 1592, No. 129, 66 Pa.C.S. §§ 2803, 2806.1, 2807, 2811, 2813-2815.

[2] 66 Pa.C.S. § 1501 (relating to character of service and facilities).

concluding that PPL's introduction of extra-record information in its Exceptions was procedurally improper; (4) whether the ALJ erred by denying Petitioner the opportunity to impeach PPL's expert witnesses during the evidentiary hearing; and (5) whether Act 129 constitutes discriminatory service which violates Section 1502 of the Code,[3] the Fourteenth Amendment of the United States (U.S.) Constitution, U.S. CONST. amend XIV, article 1 of the Pennsylvania Constitution, PA. CONST. art. I, and the Consumer Bill of Rights.[4]  After review, this Court affirms.

## Background

On November 14, 2008, the General Assembly enacted Act 129, which required EDCs with more than 100,000 customers, like PPL, to file smart meter

---

[3] 66 Pa.C.S. § 1502 (relating to discrimination in service).

[4] Petitioner presents seven issues in his Statement of Questions Involved: (1) whether the Commission failed to uphold Act 129 as written, by allowing the unintended forced installation of smart meter technology on Petitioner and circumventing Act 129 to support mandated installations when the directive presented to EDCs, e.g., PPL, that smart meter technology shall be deemed to be new service offered for the first time is clearly permissive language; (2) whether the Commission violated Section 4903 of the Crimes Code, 18 Pa.C.S. § 4903 (relating to false swearing) by twisting the General Assembly's words in its Final Order, which amounts to a dishonest purpose, untrustworthy performance of duties, neglect of fair dealing standards, and fraudulent statements; (3) whether the Commission is guilty of administrative overreach, violating the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991, by exceeding its legally granted authority and constitutional boundaries, with its interpretation of Act 129, mandating smart meters, when it is clear that was not the General Assembly's intent; (4) whether the Commission may deny Petitioner the opportunity for a substitute meter when Section 1501 of the Code authorizes remedies pursuant to Section 1505(a) of the Code, 66 Pa.C.S. § 1505(a); (5) whether the Commission erred by granting PPL's Exceptions while concluding that PPL's introduction of extra-record information in its Exceptions was procedurally improper; (6) whether the ALJ erred by denying Petitioner the opportunity to impeach PPL's witnesses, Christopher C. Davis, Ph.D. and Mark A. Israel, M.D. during the evidentiary hearing and whether the Commission erred by denying Petitioner's motion to impeach the ALJ; and (7) whether applying the mandate that affects only select customers, like Petitioner, constitutes discriminatory service under Section 1502 of the Code and violates Petitioner's constitutional rights, including but not limited to a violation of the Fourteenth Amendment of the U. S. Constitution, article 1 of the Pennsylvania Constitution and the Consumer Bill of Rights. *See* Petitioner Br. at 6-7.  This Court combined the first three issues and will address them accordingly.

2

technology procurement and installation plans with the Commission within nine months. On June 24, 2009, the Commission issued its Smart Meter Implementation Order, which set forth requirements for the smart meter plans and procedures for the submission, review, and approval thereof. On August 14, 2009, PPL filed its initial Smart Meter Plan with the Commission, in which it claimed its existing metering system met the requirements of Act 129 and the Smart Meter Implementation Order. After the Commission determined that PPL's system did not fully satisfy necessary requirements, it directed PPL to modify its Smart Meter Plan. PPL submitted its modified Smart Meter Plan on June 30, 2014, therein proposing to deploy smart meters to its 1.4 million customers from 2015 through 2021, with full deployment of meters throughout its service territory occurring from 2017 through 2019, followed by a two-year stabilization period. The Commission approved PPL's modified Smart Meter Plan on September 3, 2015.

Petitioner is a PPL customer. On May 1, 2017, PPL notified Petitioner that it intended to install a new AMI meter on his property within the following weeks. On August 24, 2017, Petitioner filed the Complaint to prevent PPL's planned installation of a new AMI smart meter at Petitioner's service address, asserting that he has the right to opt out and keep his current meter for health, fire safety, privacy, and discrimination reasons, and to prohibit PPL from terminating his electric utility service because of his challenge. *See* Supplemental Reproduced Record (S.R.R.) at 1b-10b. Petitioner also contested the Commission's interpretation of Act 129 based on the Pennsylvania Constitution and requested a hearing. *See* S.R.R. at 5b-6b. On September 13, 2017, PPL filed an answer to the Complaint, therein declaring that it was legally required under the Code and PPL's Smart Meter Plan to install the smart meters, and specifically denying Petitioner's allegations because Petitioner failed to state the specific health or safety effects of smart meters or to provide medical documentation thereof. *See* S.R.R. at 11b-20b. On March 28, 2018, PPL filed a

3

motion *in limine* to exclude Petitioner's pre-marked exhibits from being admitted into evidence.

On March 29, 2018, the ALJ held an evidentiary hearing at which Petitioner appeared *pro se*, and PPL offered four witnesses: PPL AMI Business Integrations Manager William Hennegan, PPL Senior Engineer Scott Larson (Larson), Christopher Davis, Ph.D. (Dr. Davis), and Mark Israel, M.D. (Dr. Israel). *See* Reproduced Record (R.R.) at 108-152, 186-319.[5] During the hearing, the ALJ heard argument on PPL's motion *in limine* and admitted Petitioner's exhibits. After the hearing, the ALJ directed the parties to file briefs, which they did. On August 16, 2018, the ALJ issued an Initial Decision dismissing the Complaint on the basis that Petitioner failed to prove by a preponderance of the evidence that the AMI meter installation constitutes unsafe or unreasonable service under Section 1501 of the Code. *See* S.R.R. at 21b-50b. The Initial Decision also contained certain fire safety recommendations the ALJ made for PPL. *See* S.R.R. at 38b-39b. Both parties filed Exceptions to the Initial Decision[6] and Reply Exceptions to one another's Exceptions. *See* R.R. at 376-439.

---

[5] Petitioner's Reproduced Record fails to comply with the Pennsylvania Rules of Appellate Procedure. *See* Pa.R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures . . . thus 1, 2, 3, etc., followed in the reproduced record by a small a, thus 1a, 2a, 3a, etc."). For consistency, this Court will refer to the Reproduced Record page numbers herein as they appear in the Reproduced Record.

[6] Petitioner's Exceptions asserted that the ALJ erred by: (1) ignoring his motion to impeach PPL's expert witnesses because of their financial interests as professional witnesses; (2) ignoring his motion to impeach Dr. Davis's testimony on the basis of his veracity; (3) being persuaded by and declaring credible PPL's witnesses regarding medical issues and fire safety; (4) ignoring Petitioner's legal arguments related to discrimination, constitutional violations, and unfair and deceptive practices; (5) failing to address and recognize the importance of Petitioner's National Toxicology Program Report; (6) giving little or no weight to Petitioner's exhibits because the authors thereof were not present to be cross-examined; (7) accepting Dr. Israel's testimony that there is no reliable scientific/medical basis to suggest that radio frequency exposure can cause biological effects in humans; (8) concluding that PPL is legally required by Act 129 to install a smart meter on Petitioner's property; and (9) declaring that Petitioner failed to sustain his burden

4

On October 8, 2020, the Commission issued its Final Order, therein denying Petitioner's Exceptions, granting PPL's Exceptions, and adopting the ALJ's Initial Decision as modified.[7]  *See* S.R.R. at 62b-159a.  On October 23, 2020, Petitioner filed the Petition for Reconsideration of the Commission's Final Order, therein asserting: (1) nothing in Act 129 requires every customer to endure involuntary exposure to radio frequency (RF) emissions; (2) Act 129 does not preclude PPL or the Commission from accommodating a customer's request to refuse smart meter installation; (3) the Commission violated the Commonwealth Court's decisions in *Povacz v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 492 C.D. 2019, filed October 8, 2020), *Murphy v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 606 C.D. 2019, filed October 8, 2020), and *Randall v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 607 C.D. 2019, filed October 8, 2020) (collectively, *Povacz* appeals) (i.e., *Povacz I*); (4) electro-hypersensitivity is a newly-identified neurologic pathological disorder; (5) Petitioner has undertaken additional mitigation efforts at his home; and (6) the Commission overlooked Petitioner's reasonable accommodation request.  *See* R.R. at 1-28.  On November 2, 2020, PPL filed an answer to the Petition for Reconsideration.  *See* S.R.R. at 184b-201b.

While the instant matter was pending before the Commission, this Court consolidated the *Povacz* appeals pending before it, which involved the same or similar issues.  On October 8, 2020, this Court affirmed in part, reversed and

---

of proving that installing the new AMI meter would constitute unsafe or unreasonable service in violation of Section 1501 of the Code.  *See* R.R. at 397-437.

PPL's sole Exception was to the ALJ's fire safety recommendations, which PPL claimed was unnecessary in light of the audited fire safety practices and procedures it already had in place. *See* R.R. at 376-384.

[7] The Commission modified the ALJ's fire safety recommendations to make them consistent with considerations addressed in *Schmukler v. PPL Electric Utilities Corporation*, Docket No. C-2017-2621285 (order entered July 23, 2019).

5

remanded in part, and vacated and remanded in part the Commission's final orders underlying the *Povacz* appeals. *See Povacz v. Pa. Pub. Util. Comm'n*, 241 A.3d 481 (Pa. Cmwlth. 2020) (*Povacz I*), *aff'd in part, rev'd in part*, 280 A.3d 975 (Pa. 2022) (*Povacz II*). Specifically, the *Povacz I* Court affirmed this Court's rejection of the consumers' constitutional challenge, reversed the Commission's conclusion that it lacked authority to accommodate the consumers' desire to avoid RF emissions from smart meters, and affirmed the Commission's determination regarding the burden of proving harm.

On October 27, 2020, PPL filed a Motion to Stay this Proceeding (Motion to Stay) in the instant action to extend all deadlines pursuant to this Court's *Povacz I* decision because it was not apparent at the time whether the Commission and/or other parties would seek an appeal to the Pennsylvania Supreme Court (Supreme Court). *See* S.R.R. at 164b-172b. On October 30, 2020, Petitioner objected to PPL's Motion to Stay. On November 4, 2020, the Commission entered an Order and Notice at Docket No. M-2009-2092655 that instituted a stay of formal complaint challenges to EDCs' deployment of smart meter technology as being in violation of Section 1501 of the Code, including Petitioner's, which stay would remain in place until lifted by further Commission action.

The *Povacz* parties appealed to the Supreme Court. *See Povacz v. Pa. Pub. Util. Comm'n*, 253 A.3d 220 (Pa. 2021) (*Povacz* - Allocatur). On August 16, 2022, the Supreme Court issued its Opinion in the *Povacz* appeals, holding that "Act 129 does mandate that EDCs furnish smart meters to all electric customers within an electric distribution service area and does not provide electric customers the ability to opt out of having a smart meter installed." *Povacz II*, 280 A.3d at 983. The *Povacz II* Court added: "An electric customer with concerns about smart meters may seek an accommodation from the [Commission] or EDC, but to obtain one the

6

customer must establish by a preponderance of the evidence that installation of a smart meter violates Section 1501 [of the Code]." *Id*. at 983-84 (footnote omitted).

By November 9, 2023 order (entered November 14, 2023), the Commission lifted its stay in the instant matter, *see* S.R.R. at 202b-211b, notified Petitioner thereof, and informed him of his procedural rights. On May 23, 2024, the Commission entered its Reconsideration Order. *See* S.R.R. at 212b-234b. On June 11, 2024, Petitioner appealed from the Commission's Final Order[8] and Reconsideration Order to this Court.[9] On August 12, 2024, PPL filed a Notice of Intervention.[10]

---

[8]    This Court's review of a [Commission] adjudication determines "whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are, or are not, supported by substantial evidence." *Barasch v. [Pa.] Pub[.] Util[.] Comm['n]*, . . . 493 A.2d 653, 655 ([Pa.] 1985). As to questions of law, this Court's scope of review is plenary, and its standard of review is *de novo*. *See Popowsky v. [Pa.] Pub[.] Util[.] Comm['n]*, 910 A.2d 38 . . . ([Pa.] 2006).

*Twin Lake Utils., Inc. v. Pa. Pub. Util. Comm'n*, 281 A.3d 384, 389 n.5 (Pa. Cmwlth. 2022).

[9]    *Duick* [*v. Pennsylvania Gas & Water Co.*, 56 Pa. PUC 553 (1982),] requires that a reconsideration petition identify "new and novel arguments, not previously heard, or considerations which appear to have been overlooked or not addressed by the Commission," not "'a second motion to review and reconsider, to raise the same questions which were specifically considered and decided against them.'" *Id.* [at 559] (quoting *P[a.] R[.R.] Co. v. [] Pub[.] Serv[.] Comm['n]*, . . . 179 A. 850, 854 ([Pa.] 1935)).

*Exec. Transp. Co., Inc. v. Pa. Pub. Util. Comm'n*, 138 A.3d 145, 150 (Pa. Cmwlth. 2016). This Court "review[s] a denial of reconsideration for abuse of discretion. The [Commission] abuses its discretion if the denial of reconsideration demonstrates bad faith, fraud, capricious action, or abuse of power." *Id*. at 148 n.8 (citation omitted).

[10] On September 23, 2024, Petitioner filed an Application to be Excused from Filing a Reproduced Record, which this Court denied on September 30, 2024, as untimely filed.

Discussion

1.  **Act 129**

Petitioner argues that the Commission failed to uphold Act 129, as written, by allowing the unintended forced installation of smart meter technology on Petitioner when Act 129 contains clearly permissive language and, thus, the smart meter program is opt-in only. Specifically, Petitioner contends that the Commission twisted the General Assembly's words and is guilty of administrative overreach and exceeded its authority and constitutional boundaries with its interpretation of Act 129, mandating smart meters, when it is clear that was not the General Assembly's intent.

Initially, Act 129 added Section 2807(f) of the Code, which provides, in relevant part:

> **Smart meter technology and time of use rates.--**
>
> (1) Within nine months after the effective date of this paragraph, [EDCs] shall file a smart meter technology procurement and installation plan with the [C]ommission for approval. The plan shall describe the smart meter technologies the [EDC] proposes to install in accordance with paragraph (2).
>
> (2) [EDCs] shall furnish smart meter technology as follows:
>
>> (i) Upon request from a customer that agrees to pay the cost of the smart meter at the time of the request.
>>
>> (ii) In new building construction.
>>
>> (iii) In accordance with a depreciation schedule not to exceed 15 years.

66 Pa.C.S. § 2807(f). Act 129 defines *smart meter technology* as

> technology, including metering technology and network communications technology capable of bidirectional

8

communication, that records electricity usage on at least an hourly basis, including related electric distribution system upgrades to enable the technology. The technology shall provide customers with direct access to and use of price and consumption information. The technology shall also:

(1) Directly provide customers with information on their hourly consumption.

(2) Enable time-of-use rates and real-time price programs.

(3) Effectively support the automatic control of the customer's electricity consumption by one or more of the following as selected by the customer:

> (i) the customer;

> (ii) the customer's utility; or

> (iii) a third party engaged by the customer or the customer's utility.

66 Pa.C.S. § 2807(g).

In *Povacz II*, the Supreme Court concluded: "**Act 129 does mandate that EDCs furnish smart meters to all electric customers within an electric distribution service area and does not provide electric customers the ability to opt out of having a smart meter installed**." *Povacz II*, 280 A.3d at 983 (emphasis added). The Commission and this Court are bound by the Supreme Court's ruling.[11] Because the Supreme Court has ruled that Section 2807(f)(2) of the Code mandated the system-wide installation of smart meter technology, the Commission properly interpreted that Act 129 does not include a smart meter opt-out (or opt-ins) for

---

[11] *See Commonwealth v. Koehler*, 229 A.3d 915, 934 (Pa. 2020) ("[T]he nature of precedential opinions is that they create rules of law that extend beyond the case and the parties therein, to afford protections to other similarly situated litigants."); *see also Commonwealth v. Tilghman*, 673 A.2d 898, 903 (Pa. 1996) (explaining that a majority opinion is binding precedent on the courts of this Commonwealth as to different parties in cases involving substantially similar facts pursuant to the rule of *stare decisis*).

customers. *See Schmukler v. Pa. Pub. Util. Comm'n*, 302 A.3d 247 (Pa. Cmwlth. 2023).

## 2. Section 1501 of the Code

Petitioner argues that the Commission may not deny him the opportunity for a substitute meter when Section 1501 of the Code authorizes remedies pursuant to Section 1505(a) of the Code.[12]  Petitioner also contends that the Commission erred by declaring that he failed to sustain his burden of proving that installing the new AMI meter would constitute unsafe or unreasonable service in violation of Section 1501 of the Code.  Petitioner claims that he

> does not have to prove harm or that the smart meter is unsafe, only that it is unreasonable to have a meter that has the risk of harm, forcefully installed at his property, without the option of choice.  It is unreasonable to force this device on [] Petitioner, who is currently suffering from [two] major medical conditions, after he has taken steps to remediate other wireless and microwave radiation from his property.  This [C]ourt can rule, with the evidence presented here . . . in its entirety, [installing a smart meter]

---

[12] Section 1505(a) of the Code states:

> Whenever the [C]ommission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this part, the [C]ommission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public.

66 Pa.C.S. § 1505(a).

constitutes unreasonable service under Section 1501 [of the Code].

Petitioner Br. at 41.

Section 1501 of the Code provides, in relevant part:

> **Every public utility** shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and **shall make all such** repairs, changes, alterations, substitutions, extensions, and **improvements in or to such service** and facilities **as shall be necessary or proper for the accommodation**, **convenience**, **and safety of its patrons**, employees, and the public.

66 Pa.C.S. § 1501 (emphasis added).

Although the *Povacz II* Court unequivocally ruled that Act 129 does not provide for opt-outs or opt-ins, it added:

> An electric customer with concerns about smart meters may seek an accommodation from the [Commission] or EDC,[FN]5 but to obtain one the customer must establish by a preponderance of the evidence that installation of a smart meter violates Section 1501 [of the Code].
>
> > [FN]5 This holding does not preclude an electric utility from providing a reasonable accommodation to an electric customer in the absence of a Section 1501 [of the Code] violation pursuant to a customer service policy.

*Povacz II*, 280 A.3d at 983-84.

Thus, in order to qualify for an accommodation, a customer must first "prove, by a preponderance of the evidence - with expert opinion within a reasonable degree of certainty - that the service or facility is unsafe [or unreasonable] and that a causal connection exists between the allegedly unsafe service or facility and harm, either to the public at large or to specific individuals." *Id*. at 1007. The *Povacz II* Court explained:

11

"Conclusive causal connection" means that the proffered evidence must support the conclusion that a causal connection existed between a service or facility and the alleged harm. It is not possible for evidence that is inconclusive to be sufficient to meet the preponderance of the evidence standard. Inconclusive means that the evidence does not lead to a conclusion of a definite result one way or the other. While the preponderance of the evidence standard is not stringent, it does require that the plaintiff's evidence ever so slightly (like, with the weight of a feather) supports the plaintiff's contention. Evidence that does not support a conclusion (or is inconclusive) cannot meet that minimal burden. *Accord Ethan Habrial v. Metro*[.] *Edison Co*[.], No. C-2018-3005907, 2020 WL 3840469, at *3 (Pa. P[ub. Util. Comm'n] June 29, 2020) ("The decision of the Commission must be supported by substantial evidence. 2 Pa.C.S. § 704. 'Substantial evidence' is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. More is required than a mere trace of evidence or a suspicion of the existence of a fact sought to be established."). Thus, where scientific evidence is required to establish the safety of a service or facility, use of the evidentiary standard of "conclusive causal connection" to assess the evidence is correct.

*Povacz II*, 280 A.3d at 1006-07. Therefore,

[t]o carry their [sic] burden of proof on a Section 1501 [of the Code] claim, a smart meter challenger may be required to present medical documentation and/or expert testimony demonstrating that the furnishing of a smart meter constitutes unsafe or unreasonable service in violation of Section 1501 [of the Code] under the circumstances presented.

*Povacz II*, 280 A.3d at 1000. Our Supreme Court stated, however, that "[e]ven if [c]ustomers' expert testimony was sufficient to meet the preponderance of the evidence burden of proof, the [Commission is] free to conclude that the contrary evidence was more weighty." *Id*. at 1008.

Moreover, this Court has explained that "[o]nce approved, the tariff provisions are legally binding on both the utility and its customers." *Kossman v. Pa.*

12

*Pub. Util. Comm'n*, 694 A.2d 1147, 1151 (Pa. Cmwlth. 1997) (citation omitted). Therefore, "[t]he burden of showing that a tariff is . . . unreasonable . . . is on [Petitioner].  This burden is very heavy because tariff provisions that have been properly submitted to and approved by the Commission are prima facie reasonable." *Id*. (italics omitted); *see also* Section 316 of the Code, 66 Pa.C.S. § 316 ("Whenever the [C]ommission shall make any rule, regulation, finding, determination or order, the same shall be prima facie evidence of the facts found and shall remain conclusive upon all parties affected thereby, unless set aside, annulled or modified on judicial review.").

> In addition, this Court has declared:

> The [Commission] is the ultimate finder of fact in formal complaint proceedings.  *Milkie v. P[a.] Pub[.] Util[.] Comm['n]*, 768 A.2d 1217, 1220 n.7 (Pa. Cmwlth. 2001); Section 335 of the Code, 66 Pa. C.S. § 335.  As fact[-]finder, the [Commission] is empowered to review record evidence, make credibility determinations, and accord evidentiary weight.  *Milkie*, 768 A.2d at 1221; *Verizon P[a.] LLC v. P[a.] Pub[.] Util[.] Comm['n]*, 303 A.3d 219, 239 (Pa. Cmwlth. 2023).  When reviewing a decision of the [Commission], an appellate court "should neither substitute its judgment for that of the [Commission] when substantial evidence supports the [Commission's] decision on a matter within the [Commission's] expertise, nor should it indulge in the process of weighing evidence and resolving conflicting testimony."  *Lehigh Valley Transp[.] Serv[s.], Inc. v. P[a.] Pub[.] Util[.] Comm['n]*, 56 A.3d 49, 56 (Pa. Cmwlth. 2012).  Substantial evidence is "relevant evidence which a reasonable mind would accept as adequate to support the conclusion reached." *T[wp.] of Exeter v. Zoning Hearing B[d.] of Exeter T[wp.]*, . . . 962 A.2d 653, 659 ([Pa.] 2009) (citation and quotation [marks] omitted).  The [Commission's] findings are conclusive where they are supported by substantial evidence. *Hess v. P[a.] Pub[.] Util[.] Comm['n]*, 107 A.3d 246, 258 n.7 (Pa. Cmwlth. 2014).

13

*Hughes v. Pa. Pub. Util. Comm'n*, 322 A.3d 982, 993-94 (Pa. Cmwlth. 2024). "The Commission's legal conclusions drawn from its findings, however, remain subject to judicial review." *Hess*, 107 A.3d at 259 n.7.

In *Hughes*, this Court held:

> Like the customers in *Povacz II*, [the c]onsumers similarly failed to prove that the installation of smart meters at their residence would constitute unsafe or unreasonable service in violation of Section 1501 of the Code. Although [the c]onsumers testified and presented medical letters describing their health conditions and the health conditions of family members and claimed those conditions would be exacerbated by exposure to a smart meter, they did not present expert testimony to support their claims. Instead, they relied upon an article to establish a causal connection between the low-level RF fields from a smart meter and adverse health effects, titled "Stop Smart Meters NY." However, the [Commission] found that the article constituted "unreliable hearsay evidence" because the author was not available for cross-examination at the hearing. [Commission] Opinion at 11, 19-21. The [Commission] was not persuaded by [the c]onsumers' lay opinions as to the purported health effects that RF emissions from smart meters would cause. *Id*. at 11.

> Even if [the c]onsumers met their threshold burden, the [Commission] found that PPL's credible expert evidence successfully rebutted any premise that the installation of the PPL smart meter could cause adverse health effects or exacerbate [the c]onsumers' underlying health conditions. Specifically, [Dr. Israel], a medical expert, testified that "claimed symptoms related to Electromagnetic Hypersensitivity [] are more accurately described as Idiopathic Environmental Intolerance [], in which 'idiopathic' means 'cause unknown.'" [Commission] Opinion at 11. The [Commission] found that Dr. Israel testified to a reasonable degree of medical certainty that there is no reliable medical basis to conclude that RF fields from the PPL smart meter will cause or contribute to the development of illness or diseases. *Id*.

14

In addition, [Dr. Davis], a professor of electrical and computer engineering with a Ph.D. in Physics, testified that the PPL smart meter would not cause adverse health effects. He testified that the levels of RF fields from the PPL smart meters are 98,000 times lower than the RF exposure safety limits established by the Federal Communications Commission (FCC). [Commission] Opinion at 12. He also testified that the RF fields from the PPL smart meter are much lower than typical sources such as cell phones, which can be over 260,000 times higher than a smart meter. *Id*. at 18. Persuaded by PPL's expert evidence, the [Commission] concluded that there is no reliable medical basis to conclude that RF fields from the PPL smart meter would cause, contribute to, or exacerbate any of the symptoms claimed by [the c]onsumers, or any other adverse health effects. [Commission] Opinion at 20.

As in *Povacz II*, the [Commission] in this case found that the evidence of potential harm was inconclusive and determined that [the c]onsumers failed to sustain their burden of proof. The [Commission] weighed the evidence presented and found that [c]onsumers' lay testimony regarding the potential harm from smart meters was outweighed by the contrary expert evidence. Such determinations are the sole province of the [Commission] as fact[-]finder, and we will not disturb them on appeal. *See Milkie*, 768 A.2d at 1221. Upon review, we conclude that the [Commission's] findings are supported by substantial evidence and support the conclusion that no causal connection exists between smart meters and the alleged harm.

*Hughes*, 322 A.3d at 994-96 (footnotes omitted). Dr. Israel and Dr. Davis offered similar evidence in the instant matter.

In *McKnight v. Pennsylvania Public Utility Commission*, 313 A.3d 337 (Pa. Cmwlth. 2024), the complainants similarly maintained that forcing them to choose between accepting a smart meter and forgoing electric service was unreasonable. The *McKnight* Court held:

Recognizing "the potential for overlap between an 'unsafe' inquiry and an 'unreasonable' inquiry," our Supreme Court [in *Povacz II*] observed that the customers'

15

challenges to both safety and reasonableness were "based exclusively on their personal medical conditions [and] relied on the same inconclusive research and studies regarding the effects of RF emissions on human health . . . ." *Povacz* [*II*], 280 A.3d at 1012. Based on the [the Commission's] finding that the [complainants] failed to overcome [the EDC's] contrary evidence of inconclusiveness regarding the safety of emissions from smart meters, our Supreme Court "discern[ed] no basis on which to challenge the [Commission's] conclusion that [the c]ustomers failed to establish a violation of Section 1501 [of the Code] based on unreasonable service." *Id*.

Our Supreme Court's analysis and conclusions in *Povacz* [*II*] concerning alleged violations of Section 1501 [of the Code] are directly applicable and controlling here. The [complainants], like the customers in *Povacz* [*II*], argued that they established a violation of Section 1501 [of the Code]'s safety and reasonableness requirement by offering scientific evidence of the potential for harm, along with medical evidence and their own testimony concerning the specific effects they allegedly suffered individually. As in *Povacz* [*II*], the [Commission] here found the scientific evidence of potential harm inconclusive and determined that the [complainants] failed to sustain their burden of proof. Consistent with our Supreme Court's holdings in *Povacz* [*II*], [this Court] discern[s] no basis here to disturb the [Commission's] finding that the [complainants] failed to prove a violation of Section 1501 [of the Code].

*McKnight*, 313 A.3d at 345.

At the hearing in the instant matter, Petitioner offered a written opening statement and numerous documents in support of his position that mandatory installation of smart meters is unreasonable. In particular, he produced a National Toxicology Program (NTP) report to support his claims of the potential carcinogenic or otherwise harmful effect of RF emissions to the public and his household. PPL objected to Petitioner's documentary evidence as hearsay and because none of it was authenticated and no one testified or could be cross-examined thereon. Relative to

the NTP report specifically, it was marked *draft* and *not for attribution* and was distributed solely for peer review. *See* R.R. at 261. Notwithstanding, the ALJ accepted the NTP report into evidence, to be given the probative value to which it was due.

The Commission adopted the following ALJ Findings of Fact (FOF):

21. RF fields are part of the lower energy, non-ionizing portion of the electromagnetic spectrum which consists of lower frequency signals that do not have enough energy to break chemical bonds in cells or DNA.

. . . .

23. The . . . FCC has determined safe public exposure levels for RF fields from devices that transmit RF signals, such as the AMI meters.

. . . .

42. The World Health Organization and a number of other public health authorities have concluded that the scientific research on RF exposures from cell phone use, which are far higher than the RF from PPL's smart meters, has not shown that RF fields cause adverse health effects.

43. Several [] state public health authorities also have investigated claims about health effects from smart meters and have concluded that there is no credible scientific evidence that RF fields from smart meters will cause or contribute to any adverse health effects.

44. None of [Petitioner's] exhibits are actual scientific studies and most appear to be taken from activist websites.

45. [Petitioner's] exhibits lack scientific objectivity, do not offer a balanced assessment of the scientific research on RF fields, and do not provide scientifically reliable or useful data for reaching conclusions about RF fields and the causation of any symptom or health effect.

46. There is no reliable medical basis to conclude that RF fields from the AMI meters being used by PPL will cause or contribute to the development of illness or disease.

47. There is no reliable medical basis to conclude that RF fields from the AMI meters being used by PPL would cause, contribute to, or exacerbate any of the symptoms claimed by the [Petitioner], or any other adverse health effects.

Initial Decision at 5-6, 8-9 (citations omitted).

The Commission specifically observed:

The NTP report pertains to matters which are clearly hearsay in nature and not within an exception to the rules prohibiting hearsay suitable for this Commission to accept for the evidentiary purpose advocated by [Petitioner].[13] Consequently, we are not able to make a finding of fact based on the matters asserted in the NTP report. This is so, even accepting the report in a light most favorable to [Petitioner].

Final Order at 80 (footnote omitted). The Commission further stated: "[Petitioner], as a lay person and lay witness, is not competent to provide an expert opinion regarding potential carcinogenic and/or toxicolog[ical] effects of any selected substance." *Id*. at 81.

The Commission adopted the ALJ's observation that Petitioner did not aver that he or anyone in his household suffers from medical ailments that would be negatively affected by an AMI meter. *See* Initial Decision at 13. The Commission acknowledged Petitioner's factual claim that the smart meter's location will be in close proximity to him while he sleeps. However, while recognizing its obligation under Section 1501 of the Code, the Commission found credible PPL's expert testimony that the smart meter emits RF at a substantially lower level than a cellular telephone, *see* FOFs 17, 25-33, and that RF signals occur in short, rather than

---

[13] This Court has explained that, although evidentiary rules are relaxed in administrative proceedings and an agency may receive all relevant evidence of reasonably probative value, hearsay evidence, properly objected to, is not competent to support an administrative agency's factual finding. *See Ives v. Bureau of Pro. & Occupational Affs.*, 204 A.3d 564 (Pa. Cmwlth. 2019).

18

continuous, signals of approximately 84 seconds out of every 24-hour period.  *See* FOF 26 ; *see also* Final Order at 86.  Moreover, the Commission declared that, even if Petitioner's claims were proven, Petitioner had the remedy of requesting that PPL install the smart meter at a different location in his home,[14] but there was no record evidence that he sought that remedy.  *See id*.  Thus, ultimately, the Commission determined that such evidence "did not meet the standard of substantial evidence on which the Commission must base its determinations."  Final Order at 82.

Based on this Court's review, substantial record evidence supports the Commission's factual findings.  This Court will not "indulge in the process of weighing evidence and resolving conflicting testimony[.]" *Hughes*, 322 A.3d at 995 (quoting *Lehigh Valley Transp. Servs.*, 56 A.3d at 56).  Given that Petitioner failed to prove by a preponderance of evidence that AMI meter installation on his property violates Section 1501 of the Code, he was not entitled to any accommodation.  Accordingly, the Commission did not err by not granting Petitioner an accommodation.

---

[14] The Commission stated in the Reconsideration Order:

> PPL states that it currently offers a potential accommodation to customers who have issues with the installation of an AMI meter on their properties.  Under [PPL's] Commission-approved tariff, customers can request that [PPL] relocate the AMI meter to an alternate location, so long as they pay [PPL's] estimated costs associated with such relocation.  *See*[] PPL Answer at 10, citing Rule 4(I)(2) of PPL Electric's Tariff, Supp. No. 59 to Electric Pa. P.U.C. No. 201, Third Revised Page No. 8E (stating that "[t]he relocation of [PPL] facilities, when done at the request of others, is at the applicant's expense and payment of [PPL's] estimated cost of the relocation is required in advance of construction.").

Reconsideration Order at 16.

### 3. PPL's Exceptions

Petitioner also argues that the Commission erred by granting PPL's Exceptions while simultaneously concluding that PPL's introduction of extra-record information in its Exceptions was procedurally improper.

Petitioner presented two exhibits at the hearing in support of his claim that smart meters are a safety hazard - a March 2018 news article regarding an electric meter fire, *see* R.R. at 320-324, and a compilation of articles regarding smart meter fires and explosions. *See* R.R. at 325-366. PPL offered testimony from Larson and Dr. Davis regarding the safety of its proposed AMI meters. The ALJ made the following factual findings based on the record evidence, which the Commission adopted:

> 48. PPL's new AMI meters are equipped with software and mechanisms that better alert [PPL] if there is an issue with overheating. Specifically, there is a heat alarm set within the meter software program, so when the temperature of the meter hits an established level, [PPL] is alerted of the issue.
>
> 49. PPL takes 15-minute interval temperature readings from the meter, so it can track the meter's temperature and identify any current issues or problematic trends.
>
> 50. If [PPL] detects an issue with the meter's temperature, PPL will dispatch a technician to investigate.
>
> 51. PPL has conducted substantial research and taken many steps to prevent fire incidents similar to the ones alleged by [Petitioner]. From [PPL's] research, "the root cause of the vast majority" of any fires involving new meters is the customer-owned meter bases wearing out and producing loose connections between the "blade" of the meter and the "jaw" of the meter base.
>
> 52. PPL has taken several steps to mitigate the risk of these worn out meter bases, including analyzing the materials utilized for meter bases, enhancing its inspection criteria so that its service technicians are better able to "identify

loose jaws in the field," and ensuring the new AMI meters meet the American National Standards Institute [] and Institute of Electrical and Electronics Engineers [] requirements[.]

53. The Landis + Gyr Focus E350 AX-SD AMI meter to be installed by [PPL] is neither a fire nor safety hazard.

Initial Decision at 9-10.

Despite those findings, the ALJ added fire safety recommendations for PPL. *See* S.R.R. at 38b-39b. In its Exception, PPL declared that the ALJ's fire safety recommendations were unnecessary in light of the audited fire safety practices and procedures it already had in place, which it supplied in its Exception for the first time. *See* R.R. at 376-384. In his Reply Exception, Petitioner objected to PPL's Exception on the basis that PPL raised facts not previously presented before the ALJ. *See* R.R. at 387-396. The Commission agreed with Petitioner, stating that PPL did not afford Petitioner notice or an opportunity to challenge PPL's new fire safety evidence. *See* Final Order at 92. The Commission nevertheless granted PPL's Exception "to the extent the fire safety recommendations shall be modified for consistency with considerations addressed in . . . *Schmukler v. PPL Electric Utilities Corporation*, Docket No. C-2017-2621285 ([o]rder entered July 23, 2019)[,]" because Petitioner had the burden of proving by a preponderance of the evidence that PPL's proposed smart meters presented an unreasonable fire hazard, which he failed to do. Final Order at 92.

The Commission's granting of PPL's Exception meant that the Commission disregarded the ALJ's added fire safety recommendations and, instead, relied for consistency on a prior Commission decision regarding the PPL smart meter's fire risks - also based on testimony from Larson and Dr. Davis, and which this Court affirmed on appeal. *See Schmukler*, 302 A.3d 247. Notwithstanding, because the burden of proving that PPL's smart meters are a fire hazard was on

21

Petitioner, who failed to carry his burden, the Commission did not err by granting PPL's Exception while concluding that PPL's introduction of extra-record information in its Exceptions was procedurally improper.

### 4. Impeachment/Suppression

Petitioner also argues that the ALJ erred by denying Petitioner the opportunity to dismiss Dr. Davis's and Dr. Israel's hearing testimony. He claims that "without the witness testimony, [] Petitioner would have clearly established a claim by a preponderance of the evidence and met his [b]urden of [p]roof that the smart meters have a substantial risk of harm and multiple safety issues . . . ." Petitioner Br. at 51-52.

Pennsylvania Rule of Evidence 607 states:

> **(a) Who May Impeach a Witness.** Any party, including the party that called the witness, may attack the witness's credibility.
>
> **(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa.R.E. 607. In addition, Section 5.103(b) of the Commission's Regulations provides:

> A motion may be made in writing at any time, and a motion made during a hearing may be stated orally upon the record, or the presiding officer may require that an oral motion be reduced to writing and filed separately. Written motions must contain a notice which states that a responsive pleading shall be filed within 20 days of the date of service of the motion.

52 Pa. Code § 5.103(b).

Petitioner admitted that he cross-examined Dr. Davis and Dr. Israel during the hearing, and both expert witnesses admitted that they have testified numerous times on PPL's behalf, and that PPL has compensated them for their time. *See* R.R. at 279-285, 310-313. The ALJ eventually instructed Petitioner to move on, but allowed Petitioner to present any arguments regarding bias in his post-hearing brief. *See* R.R. at 284-285. Petitioner did not raise an impeachment motion at the hearing. Rather, Petitioner first made a motion to impeach Dr. Davis's and Dr. Israel's testimony in his post-hearing brief. *See* R.R. at 166. Petitioner raised the impeachment again in his post-hearing reply brief. *See* R.R. at 457-459. Petitioner also sought to suppress Dr. Davis's testimony pursuant to Section 42.34 of the Pennsylvania Human Relations Commission's Regulations, 16 Pa. Code § 42.34, on the basis that his RF calculations were inaccurate. *See* R.R. at 462-464. The ALJ did not address Petitioner's motions in the Initial Decision.[15]

However, in the Final Order, the Commission declared that, although bias was a proper subject for Petitioner's brief and Exceptions, it was a matter of credibility, weight, and probative value the Commission is empowered to determine. *See* Final Order at 49-50; *see also Hughes*. The Commission further observed that

---

[15] Petitioner claims that the ALJ's failure to rule on the motions reflects the Commission's egregious misconduct, where the ALJ had an obligation to make Petitioner aware of any issues and rules related to his motions. However,

> [u]nder Pennsylvania law, *pro se* [litigants] are subject to the same rules of procedure as are represented [litigants]. *See Commonwealth v. Williams*, . . . 896 A.2d 523, 534 ([Pa.] 2006) (*pro se* [litigants] are held to same standards as licensed attorneys).

> Although the courts may liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon a litigant, and a court cannot be expected to become a litigant's counsel or find more in a written *pro se* submission than is fairly conveyed in the pleading.

*Kozicki v. Unemployment Comp. Bd. of Rev.*, 299 A.3d 1055, 1063 (Pa. Cmwlth. 2023) (quoting *Commonwealth v. Blakeney*, 108 A.3d 739, 766 (Pa. 2014)).

Section 42.34 of the Pennsylvania Human Relations Commission's Regulations, on which Petitioner based his suppression motion, governs proceedings before the Pennsylvania Human Relations Commission, not Commission proceedings. While the Commission would have overlooked that error in the interest of speedy resolution of the matter,[16] it declined to do so because Petitioner's impeachment and suppression motions were not raised in accordance with Section 5.103(b) of the Commission's Regulations, which affected PPL's due process rights. Because the Commission could not find in the record that Petitioner made his motions pursuant to Section 5.103(b) of the Commission's Regulations, it determined that PPL had no notice or opportunity to properly respond to either motion. Accordingly, the Commission further concluded that

> the testimony of witnesses [Dr.] Davis and [Dr.] Israel [was] sufficient for the consideration of the Commission in making a ruling in this Complaint. Giving the evidence its probative value, [the Commission] conclude[s] that PPL has met its burden of production in this Complaint and, in so doing, [the Commission] agree[s] with the ALJ that [Petitioner] did not meet his burden of proof by a preponderance of evidence.

Final Order at 53. This Court finds no error in the Commission's conclusions.


## 5. Discrimination

Petitioner also argues that applying a smart meter mandate that affects only select customers, like him, constitutes discriminatory service under Section

---

[16] Section 1.2(a) of the Commission's Regulations provides:

> This subpart shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which it is applicable. The Commission or presiding officer at any stage of an action or proceeding may disregard an error or defect of procedure which does not affect the substantive rights of the parties.

52 Pa. Code § 1.2(a).

1502 of the Code and the Fourteenth Amendment of the U.S. Constitution.[17] Petitioner specifically contends that it is discriminatory to install a smart meter at his property when EDCs that serve fewer than 100,000 customers are not subject to that requirement.

> Section 1502 of the Code specifies:
>
> No public utility shall, as to service, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. **No public utility shall establish or maintain any unreasonable difference as to service**, **either as between localities or as between classes of service**, but this section does not prohibit the establishment of reasonable classifications of service.

66 Pa.C.S. § 1502 (emphasis added).

Based on this Court's strict reading, Section 1502 of the Code prohibits PPL from supplying unreasonably different services between localities or classes of

---

[17] Although Petitioner references article I of the Pennsylvania Constitution and quotes article I, sections 1 and 2 of the Pennsylvania Constitution relative to this issue, he does not offer any analysis or conclusion related thereto. *See* Petitioner Br. at 57. "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority[,] or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *Ward v. Potteiger*, 142 A.3d 139, 143 n.7 (Pa. Cmwlth. 2016) (quoting *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009)). "Since [Petitioner] fails to reference or develop [his] [Pennsylvania Constitution] argument on appeal, that issue is waived[.]" *Ward*, 142 A.3d at 143 n.7. Although Petitioner added Pennsylvania Constitution quotes in his Reply Brief, he similarly failed to develop his arguments related thereto. *See* Petitioner Reply Br. at 12-13.

Petitioner also mentions the federal Consumer Bill of Rights in his brief with this Court. *See* Petitioner's Br. at 58-60. However, it appears that Petitioner raised that claim for the first time on appeal to this Court. It is well established that an appellate court may only consider a question on appeal that was previously raised before the Commission. *See* Section 703(a) of the Administrative Agency Law, 2 Pa.C.S. § 703(a); *see also McKnight*, 313 A.3d at 341 (quoting *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 261 (Pa. 2019)) ("[A] party waives appellate review of a claim when it fails to raise the issue before an administrative tribunal rendering a final decision."). Because Petitioner failed to raise the federal Consumer Bill of Rights before the Commission, he waived this Court's consideration of that issue on appeal.

service. *See id*. Here, the record evidence reflects that PPL is installing smart meters for all of its 1.4 million customers, including Petitioner. Because PPL has not treated Petitioner differently than its other customers, it has not violated Section 1502 of the Code. Accordingly, the Commission properly concluded that it "cannot discern any unreasonableness in service that would support [Petitioner's] allegations." Final Order at 67.

Regarding Petitioner's constitutional claims, the Commission concluded that although it is empowered to make certain constitutional determinations within the authority and jurisdiction conferred upon it by the General Assembly, it is not at "liberty to engage in the wholesale consideration and review of a legislative provision which [it] must administer." Final Order at 69. It is also well settled that "[w]here a dispute raises constitutional and non-constitutional questions, [appellate courts] will resolve it on non-constitutional grounds and avoid the constitutional issue if possible." *Pa. Interscholastic Athletic Ass'n, Inc. v. Campbell*, 310 A.3d 271, 278 (Pa. 2024); *see also Commonwealth v. Janssen Pharmaceutica, Inc.*, 8 A.3d 267, 271 (Pa. 2010) ("[I]t has long been the policy of [appellate courts] to avoid constitutional questions where a matter can be decided on alternative, non-constitutional grounds."). Because the appeals in this matter can be resolved on non-constitutional grounds, this Court need not consider Petitioner's constitutional arguments.[18]

---

[18] Notwithstanding, if this Court did address Petitioner's Fourteenth Amendment claim, it would adopt its discussion in *Povacz I*. Therein, the consumers claimed that forcing them to endure involuntary exposure to RF emissions implicated their fundamental liberty interest in personal bodily integrity. The *Povacz I* Court declined to recognize such claims based on the analysis in *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830 (N.D. Ill. 2014), that allegations of risk exposure are insufficient to state a claim for deprivation of bodily integrity under the Fourteenth Amendment to the U.S. Constitution, and there were no facts showing that the decision to implement the smart meter installations was arbitrary where the plan was part of a nationwide effort to modernize the electrical power grid, increase energy efficiency, reduce

26

### 6. Reconsideration

Petitioner asserted in his Petition for Reconsideration: (1) nothing in Act 129 requires every customer to endure involuntary exposure to RF emissions; (2) Act 129 does not preclude PPL or the Commission from accommodating a customer's request to refuse smart meter installation; (3) the Commission violated the Commonwealth Court's decisions in the *Povacz* appeals (i.e., *Povacz I*); (4) the Commission should consider an article stating that electro-hypersensitivity is a newly-identified neurologic pathological disorder; (5) Petitioner has undertaken additional mitigation efforts at his home; and (6) the Commission overlooked Petitioner's reasonable accommodation request. *See* R.R. at 1-28.

In the Reconsideration Order, the Commission found no merit in Petitioner's first three issues because he merely continues to make claims that contradict the Supreme Court's precedential and binding rulings in *Povacz II*. *See* Reconsideration Order at 18-20. Regarding Petitioner's proffer of the news article, the Commission concluded that it "does not substantiate a grant of either reconsideration and/or rehearing in this matter[,]" *id*. at 20, particularly because it is unsubstantiated hearsay and Petitioner did not aver that he suffers from any medical ailment negatively affected by an AMI meter. *See id*. at 20-21. Finally, the Commission was not persuaded by Petitioner's representations of additional measures he has taken to avoid RF emission exposure, or his repeated request for an accommodation (no smart meter at his home), for which he has not established entitlement. *See id*. at 21-22.

A reconsideration request must identify new and novel arguments or matters which the Commission may have overlooked. *See Exec. Transp. Co., Inc.*

_____

emissions, and lower costs. *See Povacz I*. Because the Supreme Court denied allocatur as to any constitutional claims, *see Povacz* - Allocatur, this Court's ruling thereon stands. *See Povacz II*, 280 A.3d at 985 n.8.

*v. Pa. Pub. Util. Comm'n*, 138 A.3d 145 (Pa. Cmwlth. 2016). Petitioner only raised one new matter - the article. However, because that evidence was not competent to support a finding of fact, *see Ives v. Bureau of Prof'l & Occupational Affairs*, 204 A.3d 564, 574 (Pa. Cmwlth. 2019) (quoting *Walker v. Unemployment Comp. Bd. of Rev.*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976)) ("Hearsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of [an administrative agency], if it is corroborated by any competent evidence in the record[.]"), the Commission did not abuse its discretion by denying the Petition for Reconsideration.

## Conclusion

For all of the above reasons, the Commission's Final Order and Reconsideration Order are affirmed.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John Kline,                      :
               Petitioner        :
                     :
         v.                 :
                     :
Pennsylvania Public         :
Utility Commission,         :    No. 918 C.D. 2024
            Respondent     :

### O R D E R

AND NOW, this 22nd day of January, 2026, the Pennsylvania Public Utility Commission's October 8, 2020 and May 23, 2024 orders are affirmed.

_____

ANNE E. COVEY, Judge